UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

|  |  |  |
|---|---|---|
| TODD SAMUEL MATTOX, #186106, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:05-cv-173 |
| | ) | |
| v. | ) | Honorable Robert Holmes Bell |
| | ) | |
| BARRY DAVIS, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. On November 8, 1996, an Ingham County Circuit Court jury found petitioner guilty of assault with intent to commit murder, MICH. COMP. LAWS § 750.83, possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, and being a felon in possession of a firearm, MICH. COMP. LAWS § 750.224f. Thereafter, the court sentenced petitioner to 25-to-45 years' imprisonment on the assault with intent to murder conviction, a concurrent 3-to-5 years' imprisonment on the felon in possession of a firearm conviction, and a consecutive term of 2 years' imprisonment on the felony-firearm conviction.

The event giving rise to petitioner's criminal convictions was the August 21, 1995 shooting of Michael D. Austin. Mr. Austin was shot in the face at close range in front of numerous witnesses. The bullet entered Mr. Austin's face and severed his spine. Michael Austin was paralyzed from the neck down and unable to breathe on his own for the remaining 12 months of his life. Four eyewitnesses identified petitioner as the man who shot Mr. Austin. Physical evidence found in the abandoned getaway car also connected petitioner to the crimes. Petitioner evaded arrest for an extended period by living under a false

identity, but was eventually arrested.  At trial, petitioner elected to testify in his own defense.  Petitioner

was unable to convince the jury that it was a case of mistaken identity, and that his brother, Mark Mattox,

had shot Michael Austin.

On February 14, 2005, petitioner filed his federal habeas corpus petition.  The petition raises

a dozen numbered grounds and includes numerous subsidiary claims:

I.      THE TRIAL COURT DENIED PETITIONER A FAIR TRIAL AND INFRINGED ON THE RIGHT TO COUNSEL WHEN IT PRECLUDED DEFENSE COUNSEL FROM ARGUING THAT PETITIONER'S BROTHER WAS THE ASSAILANT[.]

II.     THE EVIDENCE WAS INSUFFICIENT TO CONVICT PETITIONER AS A FELON IN POSSESSION OF A FIREARM BECAUSE THERE WAS NO PROOF THAT HE WAS PREVIOUSLY CONVICTED OF THE REQUISITE "SPECIFIED FELONY[.]"

III.    THE TRIAL COURT'S ERRONEOUS AND CONFLICTING INSTRUCTIONS ON CONTROLLING ISSUES OF LAW REQUIRE A NEW TRIAL, WHERE THE COURT:

        A.      FAILED TO ADEQUATELY INSTRUCT ON THE ELEMENTS OF ASSAULT WITH INTENT TO MURDER.

        B.      INSTRUCTED THE JURY THAT THE CASE INVOLVED THE "ALLEGED KILLING" OF MICHAEL AUSTIN.

        C.      FAILED TO INSTRUCT THE JURY THAT CONSIDERATION OF PETITIONER'S STATUS AS A FELON COULD NOT BE CONSIDERED AS EVIDENCE ON COUNTS I AND II.

        D.      GAVE THE STANDARD REASONABLE DOUBT INSTRUCTION, THEREBY DILUTING THE PEOPLE'S BURDEN OF PROOF.

IV.     PETITIONER'S CONVICTIONS FOR BOTH FELONY FIREARM AND FELON[]-IN-POSSESSION VIOLATE DOUBLE JEOPARDY AND REQUIRE THAT THE CONVICTION FOR THE LESSER OFFENSE BE VACATED.

V.      THE TRIAL COURT ERRED IN DENYING PETITIONER'S *BATSON* CHALLENGE TO THE DISMISSAL OF AN AFRICAN-AMERICAN JUROR, WHERE THE PROSECUTOR'S EXPLANATION WAS THAT SHE BELIEVED THAT THE JUROR HAD A COLD AND WAS "INFECTIOUS".

VI.     THE CUMULATIVE EFFECT OF THE PROSECUTOR'S MISCONDUCT DEMANDS
        REVERSAL WHERE THE PROSECUTOR:

        A.      ERRONEOUSLY AND REPEATEDLY ELICITED HEARSAY FROM
                PROSECUTION WITNESSES.

        B.      PREJUDICIALLY INFRINGED ON PETITIONER'S FIFTH AMENDMENT
                RIGHTS BY ARGUING THAT IT WAS NOT UNTIL TRIAL THAT HE
                IDENTIFIED ANOTHER PERSON AS THE ASSAILANT.

        C.      ERRONEOUSLY ARGUED THAT THE "WHEELER DEALER" WAS NOT AN
                AUTO REPAIR FACILITY, WHEN SHE HAD ELICITED NO EVIDENCE TO
                SUPPORT THAT CONTENTION.

        D.      ERRONEOUSLY SUGGESTED THIS CASE INVOLVED "MURDER" BY
                ELICITING THAT MICHAEL AUSTIN SUBSEQUENTLY DIED, SHOWING
                THAT THE INVESTIGATION WAS MADE BY "HOMICIDE" OFFICERS AND
                USING THE TERM "MURDER" IN QUESTIONING WITNESSES.

        E.      ERRONEOUSLY AND PREJUDICIALLY ELICITED EVIDENCE THAT
                WITNESSES WERE AFRAID ABOUT TESTIFYING AGAINST PETITIONER,
                OR INTIMIDATED INTO GIVING FALSE TESTIMONY AGAINST HIM.

        F.      ERRONEOUSLY VOUCHED FOR HER WITNESSES.

        G.      ERRONEOUSLY APPEALED FOR SYMPATHY FOR MICHAEL AUSTIN, HIS
                MOTHER, HIS FAMILY AND HIS FRIENDS.

        H.      ERRONEOUSLY SUGGESTED THAT PETITIONER HAD A DUTY TO
                PRODUCE HIS WIFE AS A WITNESS.

        I.      ERRONEOUSLY INTRODUCED OTHER-ACTS EVIDENCE OF PAROLE
                VIOLATIONS AND TRAFFIC OFFENSES.

        J.      PREJUDICIALLY IMPLIED PETITIONER'S MARITAL PRIVILEGE SHOULD
                AFFECT THE JURY'S VERDICT.

        K.      VIOLATED DISCOVERY] REQUIREMENTS BY FIRST PRODUCING
                INCRIMININATING DOCUMENTS AT THE CLOSE OF THE PEOPLE'S
                CASE.

VII.    THE FELON-IN-POSSESSION STATUTE IS UNCONSTITUTIONAL BECAUSE A
        DISPROPORTIONATE NUMBER OF THOSE WITH FELONY CONVICTIONS [ARE

-3-

AFRICAN AMERICAN OR OTHER MINORITIES AND THEREFORE THE STATUTE] VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT AND THE MICHIGAN CONSTITUTION[].

VIII.    PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE MICHIGAN AND UNITED STATES CONSTITUTIONS WHERE COUNSEL FAILED TO:

     A.    IMPEACH PROSECUTION WITNESS STACY MEZO WITH PRIOR INCONSISTENT STATEMENTS AT THE PRELIMINARY EXAMINATION WHICH CONTRADICTED HER IN-TRIAL IDENTIFICATION OF PETITIONER.

     B.    EITHER PRESENT EXPERT TESTIMONY ON IDENTIFICATION OR [ ] SEEK INSTRUCTIONS BASED ON *PEOPLE V FRANKLIN ANDERSON*, WHERE MISIDENTIFICATION WAS THE KEY ISSUE.

     C.    SEEK A LINEUP.

     D.    MOVE TO SUPPRESS EVIDENCE ILLEGALLY SEIZED IN A WARRANTLESS SEARCH OF THE VEHICLE.

     E.    MOVE TO SUPPRESS EVIDENCE THAT WAS FRUIT OF PETITIONER'S ILLEGAL ARREST ON AN INVALID ARREST WARRANT.

     F.    PRESENT WITNESS DEWAYNE DAWSON TO SHOW THAT WITNESS CLINT BROOKS MADE PRIOR INCONSISTENT STATEMENTS THAT THE POLICE WERE PRESSURING HIM TO IDENTIFY PETITIONER AS THE ASSAILANT.

     G.    MOVE TO SEVER COUNT III, THE FELON-IN-POSSESSION CHARGE, AND IN FAILING TO SEEK INSTRUCTIONS THAT THE JURY COULD ONLY CONSIDER PETITIONER'S FELONY CONVICTION IN DETERMINING GUILT OR INNOCENCE TO COUNT III.

     H.    IMPEACH KEY EYEWITNESS ANTHONETTE ANTES WITH HER PRIOR FELONY RECORD.

     I.    OBJECT TO PROSECUTION ARGUMENT THAT THE POLICE DID NOT CONSIDER AN ALTERNATIVE SUSPECT WAS "WORTH LOOKING AT".

     J.    OBJECT AND MOVE FOR A CURATIVE INSTRUCTION WHEN THE PROSECUTOR PREJUDICIALLY INFRINGED ON PETITIONER'S FIFTH

AMENDMENT RIGHTS BY ARGUING THAT IT WAS NOT UNTIL TRIAL THAT HE IDENTIFIED ANOTHER PERSON AS THE ASSAILANT.

K.   PRESENT EVIDENCE AT SENTENCING TO SHOW MICHAEL AUSTIN'S EXTENSIVE CRIMINAL HISTORY OF VIOLENCE.

L.   OBJECT TO IMPROPER INSTRUCTIONS.

M.   OBJECT TO THE PREJUDICIAL OTHER-ACTS EVIDENCE OF PETITIONER'S ALLEGED PAROLE VIOLATIONS AND DRIVER'S LICENSE SUSPENSION.

IX.   THE CUMULATIVE EFFECT OF THE ERRORS JUSTIFY REVERSAL.

X.   PETITIONER WAS DEPRIVED OF HIS LIBERTY WITHOUT DUE PROCESS OF LAW WHERE TRIAL COUNSEL FAILED TO RENDER EFFECTIVE ASSISTANCE OF COUNSEL AS REQUIRED BY THE SIXTH AMENDMENT OF THE UNITED STATES AND MICHIGAN CONSTITUTIONS.

A.   TRIAL COUNSEL FAILED TO CALL EYEWITNESS SABRINA JOHNSON-MATTOX AND RES GESTAE WITNESS TAMMY LEE ON BEHALF OF PETITIONER.

B.   TRIAL COUNSEL'S FAILURE TO OBJECT AND MOVE FOR A CURATIVE INSTRUCTION WARNING THE JURY NOT TO CONSIDER THE PROSECUTOR'S IMPROPER STATEMENTS DURING CLOSING CONSTITUTED INEFFECTIVE ASSISTANCE.

C.   THE CUMULATIVE EFFECT OF TRIAL COUNSEL'S ERRORS RENDERED HIM CONSTITUTIONALLY INEFFECTIVE AND DENIED PETITIONER A FAIR TRIAL.

XI.   THE PETITIONER WAS DEPRIVED OF HIS LIBERTY WITHOUT DUE PROCESS OF LAW WHEN THE PROSECUTOR USED PERJUR[ED] TESTIMONY TO GAIN HIS CONVICTION.

XII.   PETITIONER WAS DENIED HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL ON HIS APPEAL AS OF RIGHT.

(Petition, Attachment C at 1-34, docket # 1).  Respondent's answer (docket # 23) asserts that all the grounds raised by petitioner are meritless, and that Grounds III and VI are barred by procedural default.

-5-

Upon review, I find that all the grounds raised by petitioner are meritless, and further find that all petitioner's Ground III claims are barred by procedural default.  For the reasons set forth herein, I recommend that the petition be denied.

### Procedural History

1.      **Trial**

Petitioner's four-day jury trial began on November 4, 1996, and concluded on November 8, 1996, with the jury's verdict of guilty of assault with intent to commit murder,  possession of a firearm during the commission of a felony, and being a felon in possession of a firearm.  (TT I-IV, docket #'s 32-35).

On November 4, 1996, the first day of petitioner's trial, before jury selection, Judge Carolyn Stell discussed the stipulation defense counsel had entered into with the prosecutor relating to the felon-in-possession of a firearm charge against petitioner.  Petitioner was represented at trial by Attorney Renee Cooper.  Petitioner had multiple prior felony convictions:  assault with intent to do great bodily harm less than murder; assault with a dangerous weapon (felonious assault); and carrying a concealed weapon.  The stipulation provided that petitioner had been previously convicted of a felony, and that as of the date of the shooting petitioner had not completed all of the conditions of his parole.  It is patent that the stipulation benefitted petitioner because it kept from the jury any evidence regarding the violent nature of petitioner's prior felonies.  (TT I, 3-4).

During the jury selection process Attorney Cooper made a *Batson* challenge to the prosecutor's exercise of a peremptory challenge against a potential juror in seat # 10, Mr. Taylor. Catherine Emerson, Assistant Ingham County Prosecuting Attorney, indicated for the record that both the

victim and petitioner were both black males, therefore there was no basis for any claim that her challenge

to juror # 10 was based on racial differences between the accused and the victim.  She also noted that an

African-American woman had already been seated on petitioner's jury.  (TT I, 17).  Emerson explained

her specific reason for exercising a peremptory challenge against Juror # 10 as follows:

> My concern with Mr. Taylor -- and I often do this -- is how do[es] the whole jury mix together?
> I came up; I approached the bench.  It is clear that Juror No. 10, Mr. Taylor, has a miserable cold.
> He is sniffling and sneezing.  I several times turned around and saw him in the back row.  He is
> clearly what I would consider to be infectious.
>
> When he sat down, I noticed the other jurors kind of leaning away from him.  When he
> spoke, he had red eyes.  He seemed to have a stuffy head.  I was concerned that his health would
> not get better during the course of the week.  I know that he gave us an estimation that perhaps it
> would or he could probably eke it out anyway, and I also had considerations for all the jurors in the
> courtroom or in the small jury room for a week with a man who was clearly infectious and had a
> cold.
>
> I believe that under peremptory challenges, especially -- obviously, I have not systematically
> kicked all the black people off any jury I've picked.  I'm certainly not doing it in this particular
> case, and I believe the law allows me the right to exercise my peremptory challenges in that way.

(TT I, 18).  Judge Stell, having had the benefit of seeing the objective manifestations of Juror # 10's health

and hearing the prospective juror's voice and any sniffling and sneezing, found that no *Batson* violation

had occurred:

> To establish a prima facie case, a defendant must show that he is a member of a cognizable
> racial group and he has done so.  He must also show that the Prosecutor exercised peremptory
> challenges to remove from the venire members of the Defendant's race and that these facts and any
> other relevant circumstances raise an inference that the Prosecution used that practice to exclude
> the venireman from the petit jury on account of their race.
>
> Defendant has been unable to do so.  As the Prosecutor has pointed out, there is an Afro-
> American female seated in seat # 11 in addition.  So I don't think that any pattern has been
> established of using peremptory challenges purely on the basis of race.
>
> Therefore, it's not necessary for the Prosecutor to come up with a neutral explanation for
> challenging Juror No. 10, Mr. Taylor.  However, she has done so, and I believe that is a racially
> neutral issue.
>
> With respect to the argument that lots of other jurors weren't excused that made reasonable
> answers, I would point out, from the Court's point of view, that lots of jurors were excused that
> made reasonable answers, and I don't infer from any of those excusals by either attorney that

-7-

there's any basis other than good professional judgment as to what constitutes a fair and impartial jury.

The challenge to the venire is denied.

(TT I, 19-20).

During petitioner's trial, the prosecution introduced evidence from four eyewitnesses, Stacy Mezo, Anthonette Adams, Clint Brooks, and Dawn Bethany. All four eyewitnesses identified petitioner as the man who shot Michael Austin in the face on August 21, 1995. The shooting had occurred on a clear day in an outdoor area of the Hickory Woods Apartments located in Lansing, Michigan. Stacy Mezo and Anthonette Adams shared a Hickory Woods apartment. Mezo testified that on the date of the shooting, Sabrina Johnson and Sabrina's cousin Sylvia "Poochie" Johnson came to Hickory Woods looking for Anthonette Adams. Mezo contacted the police, but Michael Austin, the father of Ms. Mezo's children, arrived at the apartments before the police. Mezo advised Mr. Austin that Sabrina and Poochie Johnson were trying to cause trouble with Anthonette Adams. Austin purportedly confronted Sabrina and Sylvia Johnson and told them to take their fight elsewhere because there were numerous children around the apartments. The four eyewitnesses described how petitioner then appeared, confronted Mr. Austin, produced a gun, and at arms length, shot Michael Austin in his face. Stacy Mezo saw petitioner and Sabrina Johnson leave the scene together. Witnesses provided the police the license number of the getaway vehicle. The getaway car was a rental car. The police found the car abandoned in tall grass in a marshy area located roughly a mile from a Lansing business known as the Wheeler Dealer. The steering column of the car had been damaged and its tire jack was missing. The car had been rented from a Detroit Metropolitan Airport location under the name Mark Mattox. Among the evidence police recovered from inside this car was a zippered pouch. The pouch had been located in a pocket on the back of the passenger's seat. Three items inside the pouch connected petitioner to the getaway car: (1) a fax from

-8-

Brian Griffiths addressed to petitioner; (2) an "Order of Action" from the Michigan Department of State with petitioner's name and license number on it; and (3) an August 5, 1995 Mega Movies receipt identifying petitioner as the customer.  (TT III, 50-51, docket # 34).[1]

Attorney David Feinberg testified that at approximately 1 p.m. on August 21, 1995, he was contacted by Sylvia "Poochie" Johnson regarding the shooting that Poochie and her cousin Sabrina Johnson witnessed earlier that day.  (TT III, 103-04, 119, docket # 34).  Attorney Feinberg and his partner, Attorney Manvir Grewal, drove to Poochie's neighborhood and picked her up.  Feinberg, Grewal and Sylvia "Poochie" Johnson then proceeded, at Sylvia's direction, by car towards a Grand River Avenue location near the Capital City Airport.  This route took this group directly past the Hickory Woods Apartments where Sylvia had indicated that she had witnessed the shooting.  Emergency and police vehicles were still present on the scene.  (*Id.*, 71, 106).  The group's initial effort to locate Sabrina Johnson along Grand River Avenue was unsuccessful, but after Sylvia placed a call to her mother, the group met petitioner and Sabrina Johnson outside the Wheeler Dealer on North Grand River Avenue.  Attorneys Feinberg and Grewal testified that they had not anticipated picking up anyone other than Sabrina Johnson. (*Id.* 68, 96, 131).  Both attorneys later identified petitioner from a police lineup as the man they had observed with Sabrina Johnson.  Attorney Grewal testified that petitioner was emphatic that "Nobody's talking to Metro," indicating that Sabrina Johnson would not be talking to the Tri-County Metropolitan Police Squad.  (*Id.*, 74).  When Attorney Feinberg asked petitioner if he had been at the crime scene, petitioner denied having had any involvement.  (*Id.*, 73).  Attorney Grewal testified that petitioner was

---

[1]The trial court rejected an argument that petitioner's counsel made on the third day of trial that the pouch and its contents should be excluded from evidence on the basis of an alleged violation of the court's discovery order.   The court found that no discovery violation had occurred, and that none of the evidence inside the pouch had been exculpatory.  (TT III, 12-13).

"adamant that he did not want to go back to the crime scene." (*Id.*, 78). At petitioner's request, the attorneys then transported petitioner to the North Willow Apartments where petitioner was dropped off. (*Id.*, 113). Feinberg testified that the North Willow Apartments were "not very far" from the Hickory Woods Apartments. (*Id.,* 114). Sabrina Johnson did not leave with petitioner, but instead remained in the car.

The attorneys and Sabrina Johnson and Sylvia "Poochie" Johnson then traveled to the Hickory Woods Apartments. They parked a short distance away from the crime scene. Attorney Feinberg got out of the car, and he walked over and spoke with the officers conducting the investigation. (*Id.*, 115). The two women and Attorney Grewal remained inside the car. Feinberg's phone bill indicated that he made a total of seven calls during the period from 2:01 p.m. to 2:38 p.m. while Feinberg was at or near the crime scene. (*Id.*, 84). Feinberg was able to discover that the police were looking for a male and the two females who had fled the scene after the shooting. When Attorney Feinberg returned to the car, Sabrina Johnson indicated that she wanted to go back to the North Willow apartment where petitioner had been dropped off. (*Id.*, 87-88). The attorneys complied with Sabrina's request. (*Id.*, 88). The attorneys then dropped off Sylvia Johnson at her mother's house. When interviewed by the police, both attorneys picked petitioner out of a lineup. Both attorneys testified at trial that petitioner was the man they had seen with Sabrina Johnson on August 21, 1995. (*Id.*, 73, 110).

Petitioner elected to take the stand in his own defense. (TT IV, 73-170, docket # 35). Petitioner testified that in August of 1995, he was on parole and that he had been staying in his mother's house in Detroit. (*Id.*, 78-79). Petitioner stated that his parole officer knew of his relationship with Sabrina Johnson. Petitioner claimed that he had an understanding with his parole officer and that he was permitted to go to Lansing and spend nights with Sabrina Johnson at her apartment. (*Id.*, 81).

-10-

Petitioner offered testimony to explain the presence of his personal items inside the rental car. Petitioner stated that his brother Mark Mattox had rented the car because Mark's car had been damaged in a hailstorm. Petitioner testified that on the weekend of August 19, 1995, petitioner, Sabrina Johnson, petitioner's brother Mark Mattox and Mark's wife flew from Detroit's Metropolitan Airport to Atlanta, Georgia. The rental car had been the group's transportation to the airport from Mark's house in Westland, Michigan. (TT IV, 85-88). Petitioner testified that in Georgia he married Sabrina Johnson, and that she had changed her name to Sabrina Mattox. (*Id.*, 75-76, 83). Petitioner testified that after they returned to Michigan, Mark gave petitioner and Sabrina a ride back to Lansing in the rental car. Petitioner claimed that all three of them stayed overnight at Sabrina's apartment. (*Id.*, 89). No testimony other than petitioner's placed Mark Mattox in the Lansing area on the date of the shooting.

Petitioner testified that on the morning of August 21, 1995, at Sabrina's apartment, he received a call from Sylvia "Poochie" Johnson. (TT IV, 93). Sometime after that, Mark Mattox and Sabrina Johnson left the apartment with apparent plans to go to a local mall to purchase shoes. (*Id.*, 92). They purportedly left petitioner behind at Sabrina's apartment. (*Id.*, 92-93).

Petitioner testified that he knew he needed transportation to Detroit that day because he had to meet with his parole officer in Detroit before 4:30 p.m. (TT IV, 96). He testified that around noon Sabrina's father returned with Sabrina's car. (*Id.*, 99, 100). Petitioner claimed that he drove Sabrina's father back to his apartment and dropped him off. (*Id.*, 100). Sabrina Johnson's father never testified at petitioner's trial. Petitioner testified that he did not go directly back to the Sabrina's apartment, but instead petitioner claimed that he went to a Quality Dairy store and purchased some spring water. (*Id.*, 101). Petitioner testified that he arrived back at Sabrina's apartment at 12:25 p.m., and that a short time later he received a "disturbing" telephone call from Sabrina. (*Id.*, 101-02). Petitioner claimed that based on this

conversation with Sabrina, he drove Sabrina'a car to the Wheeler Dealer located on Grand River.  (*Id.*, 103-04).  Petitioner claimed that he met Sabrina at that location.  (*Id.*, 105).  Petitioner testified that Sabrina was very agitated.  (*Id.*, 105-06).  Petitioner stated that when he got out of the car, he left the engine running.  (*Id.*, 106).  Petitioner claimed that he then encountered his brother, Mark Mattox, who purportedly stated, "I got to get the hell out of here.  I have to get the hell out of here."  (*Id.*, 108).  Petitioner testified that Mark Mattox then "took off" in Sabrina's car leaving petitioner and Sabrina behind.  (*Id.*, 108-09).  Petitioner offered the following testimony concerning a conversation he claimed to have had with Sabrina:

> I said, "Where the f--- is you going man," you know.  "Hold on."  And he just skirted off.  So I turned and ran towards Sabrina, because she's still walking.  So I go down towards her, and so we kind of like walking.  I'm slowing her pace down and I'm trying to calm her down.
> I'm asking her like, "Well, what happened, what happened?"  She's like, "He's a crazy motherf-----; he's a crazy motherf-----."  You know, and I was like, "Well, what happened?  What's going on?"  And she was like, "The crazy motherf----- just shot somebody."

(*Id.*, 109).  Petitioner offered testimony that he and Sabrina walked a short distance, then she purportedly stated, "He [Mark] just shot somebody; he just shot somebody."  (*Id.*, 113).  Petitioner claimed that he and Sabrina went into an office building with the intent to call someone who could provide petitioner with a ride to Detroit to meet with his parole officer.  (*Id.*, 114).  Petitioner claimed that he placed a call to Aunt Martha's house (Sylvia "Poochie" Johnson's mother's house) and spoke with Aunt Martha.[2]  (*Id.*, 115-16).  Petitioner claimed that after the conclusion of this telephone call, he and Sabrina waited in a reception area for someone to pick them up.  (*Id.*, 117-19).  After about 10 or 15 minutes, Sabrina went back to make another telephone call.  (*Id.*, 118).  No witness from the office building appeared or offered any testimony supporting petitioner's version of events.  Petitioner claimed that after the second telephone call, he and

---

[2]"Aunt Martha" never testified during petitioner's trial.

Sabrina purportedly went to "a black tar driveway" located on Grand River Avenue where they waited. (*Id.*, 120). Petitioner described being picked up by Attorneys Grewal and Feinberg and Sylvia Johnson (*Id.*, 121-22) and being dropped off at Sabrina's father's apartment. (*Id.*, 126). Petitioner testified how he got out of the car, leaving Sabrina and Sylvia with the attorneys. (*Id.*, 127). Petitioner claimed that he called Sabrina's sister "Neesy" from Sabrina's father's apartment and spoke with Neesy's boyfriend "Billy." Petitioner testified that this Billy picked him up and drove him to Detroit where petitioner claims to have met with his parole officer. (*Id.*, 132-34).[3]

Petitioner testified that after he met with the parole officer he had a meeting with his brother Mark Mattox at their mother's house, and based on their conversation, petitioner decided to take Sabrina and hide from the police:

Q    Okay, What is the decision you make?

A    The decision I had to make is I had to -- I had to get my wife to come down to Detroit, and I had to keep her like -- it was like I had to -- this is the flat-out truth. I had to get my wife to come down to Detroit and I had to keep her down there. I had to keep her down that way, down Detroit way for a couple of days.

(TT IV, 138). Petitioner claimed that he and Sabrina stayed a few nights at his mother's house, followed by more than a week at an aunt's house. (*Id.*, 139). Petitioner testified that he then obtained "some information," and based on that information he knew that he "had to get away from [his] people." Petitioner went into hiding and took Sabrina Johnson with him. (*Id.*, 140). Petitioner concluded his direct testimony with statements to the effect that his brother Mark Mattox had financed petitioner's transition to a life under a false identity in East Detroit. (*Id.*, 141-42).

---

[3] "Neesy," Billy, and petitioner's parole officer did not testify.

Petitioner testified that at the time of his trial, Sabrina was living in Detroit and that she had "recently" visited him.  (TT IV, 76-77).  On cross-examination petitioner was asked where Sabrina was and why she wasn't anywhere in the courtroom.  (*Id.*, 143-45).  The following exchange occurred during cross-examination:

> Q    All right.  On August 21st, 1995, you're stating that there came a point when you thought your brother shot and perhaps killed somebody and that your wife was somehow involved, correct?
>
> A    That he had shot someone and my wife was, yeah, present.  She was present at the time.
>
> Q    All right.  But regardless of that -- well, first of all, you then later made a decision to keep your wife quiet and yourself quiet to protect your brother; that's your testimony.
>
> A    I made the decision in my mind that -- yeah.
>
> * * *
>
> Q    Yes or no, isn't it true that you testified that the reason you had her [] do that is because you didn't want her talking to the police?
>
> A    Talking to the police?  I didn't -- if you want --
>
> Q    Is that a yes or a no?
>
> A    If you want to take it that way, yes.

(*Id.*, 149-50, 153).   Petitioner was cross-examined about the extensive measures he took to conceal his identity under the alias of Carl Monroe or Carl Moore.  (*Id.*, 152-54). When asked where Sylvia "Poochie" Johnson was, petitioner's response was, "I wish I knew."  (*Id.*, 155).

Petitioner was briefly questioned regarding the absence of evidence that petitioner had obtained permission from his parole officer to travel outside of Michigan for his alleged trip to Georgia. (TT IV, 146).  When asked if Sabrina's apartment was within a block or two of the Sadie Court street address where the shooting had occurred, petitioner provided a non-responsive answer: "I don't know no

-14-

Sadie Court Apartments." (*Id.*, 149).    Petitioner denied driving the rental car from the scene of the shooting down a dirt road and into the weeds where the police found it.  Petitioner denied using the car's jack handle to damage the car's steering column to make it appear as if the car had been stolen.  (*Id.*, 160). Petitioner testified as follows in response to cross-examination concerning disposal of the gun and jack handle:

> Q.    Yes or no, isn't it true that in that field and walking through that field toward Grand River, you tossed the gun, the nine millimeter gun that you used to shoot Michael Austin and tossed the jack handle?
>
> A     I have no knowledge of what you're talking about, ma'am.

(*Id.*, 160).

The defense rested after the conclusion of petitioner's testimony.  The prosecutor's closing argument summarized the evidence against petitioner on the three criminal charges.  The closing argument was delivered without objection.  Defense counsel's closing argument in response was multi-faceted. Attorney Cooper emphasized the prosecution's burden of proof and the presumption of petitioner's innocence.  Counsel argued that the prosecutor, "the Government's lawyer," had been a little bit deceiving in her closing argument by glossing over various inconsistencies.  (TT IV, 181-82, docket # 35).  Defense counsel argued the rapidity of events, limited opportunity for witnesses to observe, inconsistencies in the witness statements, and the impeachment of witnesses with their prior statements.  Defense counsel emphasized the similarities in petitioner's and Mark Mattox's facial features and complexion.  Attorney Cooper criticized police procedures because the police failed to focus on petitioner's brother Mark as a suspect.  The court found that defense counsel had stepped beyond the bounds of permissible argument when he had argued, without any supporting record evidence, that it had been and could only have been Mark Mattox who had damaged the car's steering column to make it appear that the car had been stolen.

-15-

They're checking what makes sense to check, the stuff that was ripped off from the steering column that the person who was trying to make this look like, you know, a stolen car, that's the stuff that they would be touching. So that's where you check. So they check that; they do not find Todd Mattox's fingerprints on the stuff that's ripped off the steering column.

Well, why don't they stop thinking its him and start listening to Stacy Mezo and check for Mark Mattox's fingerprints on it? We don't know what the results would have been. Well they get 15 latent prints, some of those are going to be Mark Mattox's. Why? He's the guy ripping off the stuff that makes it look like it's stolen.

THE COURT: Mr. Cooper, I don't think you can argue that it's got to be Mark Mattox. That is beyond the scope of closing argument.

MR. COOPER: That it's got to be Mark -- oh, I don't remember -- I don't even know when I said it or at what point, so . . .

THE COURT: Well, what you said was inappropriate, and I'm instructing the jury to disregard it.

(*Id.*, 203-04). Attorney Cooper emphasized that petitioner was not claiming that he had an alibi of being out of town when Michael Austin was shot. Counsel argued that petitioner, although present in Lansing, had not been at the scene of the shooting. From petitioner's perspective, defense counsel offered the following "bottom line" argument: "You know, the bottom line is, I didn't do anything. The bottom line is, my brother did." (*Id.*, 209). Defense counsel attempted to portray petitioner's decision to move and live with his wife under a fictitious name as an effort by petitioner to keep his brother, the actual shooter, "out of it" and to keep his wife from becoming involved. (*Id.*, 209).

The prosecutor's rebuttal argument acknowledged that there had been some minor inconsistencies in witness testimony, but she emphasized that witnesses are the people actually present at the crime scene, not necessarily those the prosecution would have chosen if it had the power to do so. The relevant excerpt is set forth verbatim below:

First you're told, the theme number one, is that mean old Government interference, and they have presented you with bad witnesses and they've interfered with the evidence.

-16-

First of all, we represent the people of the State of Michigan; it's not a machine.  Part of the people of the State of Michigan include Michael Austin's mother and family and friends.  It certainly includes everyone in the community.

We do not pick and choose our witnesses.  The witnesses are the people who are there, and they are the people they are.  They are presented to you, and they are given to you in their entirety.  You know Clint Brooks has a felony on his record; you know he's in prison.

You know that Dawn Bethany is afraid and will even commit perjury if she's afraid.  You know that Ricky Reed gets confused quite easily, and you also know that Anthonette Antes was -- a bit of a feud with other people.

They were people; they have their faults.  We don't pick and choose them.

(TT IV, 211).

Among other things, the prosecutor's rebuttal argument addressed defense counsel's attempt

to persuade the jury that the police had been inept when they failed to pursue Mark Mattox as a suspect:

The other thing is the whole business about why not check the prints for Mark Mattox.  First of all, you've heard from the detectives and all the witnesses, and there wasn't one piece of evidence that pointed to the fact that Mark Mattox, who lives, and works and has a house in Detroit, had anything to do with this particular scene.

In fact, the Defendant said he and his wife went out of their way not to make that inference.  And in fact, the Defendant, who was at the preliminary examination in July and knowing that he's facing a trial, came and told you today that he's now claiming it's his brother.

But the police didn't compare them to Mark's prints because there was not one evidence, not one witness, not one anybody who said he was even worth looking at.

* * *

So there's nothing, except the Defendant, to point to Mark.  And, in fact, I'd like you to think about the fact that Sabrina Johnson, who, according to the Defendant's version of events, knows where her husband is and speaks to him every day and hasn't appeared in the courtroom.

MR. COOPER:  Judge, that's not evidence.  That can't be used as evidence.  There's no evidence of that kind that came from the witness stand or any event anywhere.

THE COURT:  She can argue that the  -- Sabrina Johnson-Mattox has not come forward to the police.  It is -- other than that, she can make no argument.

MR. COOPER:  Well, she was doing something other than that.

THE COURT:  Rephrase.

MS. EMERSON:  Thank you.  Didn't come forward to the police at all, even during this week, not even Monday, not even Tuesday, not even Wednesday.

-17-

MR. COOPER:  Judge, I object to that.  There's no evidence of the fact that she didn't. Whoever said that she didn't?

THE COURT:  Overruled.

MS. EMERSON:  Actually, with regard to that, I think the record's clear that the detectives have been looking for her.  We've asked each and every witness where she is, and the Defendant testified that he was the one that pulled her out of Lansing, her connections under Lansing, lived with her under his assumed named [sic], so that they wouldn't be found.  He says it's as a motive to protect his brother, but he clearly tells you that he took his wife away to hide her so that her testimony would not be out.

(TT IV,  214-15).

In the context of rebuttal argument, addressing petitioner's claim that by going underground,

petitioner was somehow attempting to protect his wife and his brother who was not a suspect, the

prosecutor made a single passing reference to state-law marital privilege:

He says it wasn't him and he had nothing to do with it.  But he went to Detroit, he changed his name to Carl Moore, he got a fake birth certificate from Ohio, a fake driver's license from Ohio and hauled his wife out of Lansing to live under an assumed name.
Now, what did his brother, Mark Mattox, do?  He kept working at General Motors or Ford and built himself a house.  He didn't go underground, he didn't hide, he didn't do anything.  He kept on doing what he's always doing.  And we suggest to you that's because it was the Defendant who committed the crime, and so the Defendant had to go underground and the brother, who did not.  So the brother stayed and kept on doing what he was doing.
Also, take a look at what he would be willing to make such a huge change in his life for.  According to the Defendant's statement, all he knows is that he gets a call from his wife -- of course there's husband/wife privilege, so whether or not he'd ever have to testify on that remains to be seen.

MR. COOPER: Objection, your honor.  That's not in evidence.

THE COURT: I'm sorry, what's not in evidence?

MR COOPER: Something about a husband/wife privilege.  If you're going to give them an instruction on the entire privilege, that's the law that comes from the Court; she can't give the law.

THE COURT: No, I'm not going to be commenting on the marital privilege.  Please proceed without arguing that.

-18-

(TT IV, 216-17).

      Judge Stell delivered the jury instructions without objections.  (TT IV, 222-39).  Shortly after the jury retired to begin its deliberations they sent out a note asking the questions, "Can we clarify what does the Wheeler Dealer have on site?  Is it an office or does it have a garage for service?  How can we clarify this?  Was it in the testimony or closing statements?"  After discussing the matter with counsel, Judge Stell instructed the jury as follows: "I would remind you that you have your packet of instructions as to the elements of each of these crimes.  We would instruct you to direct your attention to those elements and not to other matters.  Please continue your deliberations."  (*Id.*, 242).  No objections were made to the judge's supplemental instructions.  Roughly an hour after beginning its deliberations, the jury returned a verdict finding petitioner guilty on all three criminal charges.

      Judge Stell sentenced petitioner on December 4, 1996 (Sentencing Transcript ("ST"), docket # 36)  and made the following findings before imposing sentence:

      Looking first at protection of society, Mr. Mattox was able to argue to the jury very eloquently through his attorney that this was a case of mistaken identity and that it was his brother who committed this act and not he.  The jury rejected that defense, although Mr. Mattox has every right to continue to maintain his innocence.

      The act was exceptionally cold-blooded and gives new meaning to the word senseless violence.  To engage in a discussion or argument and, within minutes or seconds, to raise a gun, point it in the victim's face, have the victim knock the arm down and to raise the arm and shoot the victim in the face is an inexplicable act for a human being to perform.

      The jury determined, based on all the evidence, that Todd Mattox was the person who committed that act.  That was a determination that was supported by the evidence.

      Mr. Mattox argues that since he was on parole for assault with intent to commit great bodily harm and felonious assault at the time of this offense, that he really couldn't be a threat to society because the Michigan Department of Corrections doesn't put people on parole if they are a threat to society.

The Michigan Department of Corrections isn't supposed to put people on parole if they are a threat to society. However, like any other organization composed of people, [it] sometimes make[s] mistakes . . . .

Based on all of the testimony at trial and the presentence report, the Court believes that Mr. Mattox represents a very significant threat to society. All of his previous convictions involved, if not violence, the potential for violence. Because in addition to the assault with intent to commit great bodily harm and the felonious assault, he has a prior conviction for carrying a concealed weapon.

* * *

He committed these new and terrible offenses while he was on parole. It is clear from the testimony at trial that he did everything possible to keep his wife from speaking with the police officers, and he, himself, decided that the best resolution was to assume a false identity and go underground for almost a year, as he has acknowledged.

That, to the Court, does not speak of a person who is regretful for actions that someone else took and wishes to be a contributing member of society.

(ST, 7-9). Judge Stell then sentenced petitioner to 25-to-45 years' imprisonment on the assault with intent to murder conviction, a concurrent 3-to-5 years' imprisonment on the felon in possession of a firearm conviction, and a consecutive term of 2 years' imprisonment on the felony-firearm conviction. (ST, 10).

## 2.  Appellate Proceedings

Attorney Kenneth Birch was initially appointed to represent petitioner in his appeal as of right. Petitioner wrote a letter advising Attorney Birch that petitioner did not want Birch representing him and asking Attorney Birch to withdraw from the representation. Attorney Birch filed a motion to withdraw in accordance with petitioner's request. After conducting a hearing on the motion, the court granted Birch's motion to withdraw.

Petitioner retained Attorney Linda Ashford to represent him on direct appeal. The issues Attorney Ashford raised on petitioner's behalf were generally[4] the same issues petitioner now raises in his

---

[4]Petitioner's direct appeal did not include Grounds X, XI and XII. Those claims were raised and exhausted in petitioner's application for post-conviction relief and related appeals.

-20-

habeas corpus petition.  (Defendant-Appellant's Brief on Appeal at xv, Statement of Questions Presented, Michigan Court of Appeals record, docket #38).  Attorney Ashford filed a 10-page brief in response to the prosecutor's appellate brief.  (Defendant's Reply to Appellee's Brief on Appeal, docket # 38).

Attorney Ashford filed various motions on petitioner's behalf in the Michigan Court of Appeals.  Ashford filed a 19-page motion, excluding exhibits, asking the appellate court to remand the matter to the trial court for a *Ginther*[5] hearing on 19 claims of ineffective assistance of trial counsel. (Motion for Remand for *Ginther* hearing, Michigan Court of Appeals record, docket # 38).  On December 30, 1997, the Michigan Court of Appeals entered an order denying the remand motion, and the Michigan Supreme Court denied the application for leave to appeal the order.  (Both orders are found in the Michigan Supreme Court record, docket #39).  Ashford filed a motion asking the Michigan Court of Appeals to remand the matter to the trial court for a hearing on a motion for a new trial based on newly discovered evidence.  This motion claimed that the timing of Clint Brooks's trial testimony and a post-trial stipulation concerning Brooks's sentence suggested that, contrary to Brooks's testimony, Brooks may have had an agreement with the prosecutor's office.[6]  On February 10, 1999, the Michigan Court of Appeals issued an order remanding the matter to the Ingham County Circuit Court.  (2/10/1999 Order within the Michigan Court of Appeals record, docket # 38).   The remand was limited the issues raised in the motion for remand, and the appellate court retained jurisdiction. On March 23, 1999, Judge Stell conducted a hearing on petitioner's motion for a new trial.  (docket # 37).  After hearing witness testimony and the arguments of counsel, the trial court made the following findings:

_____

[5]*People v. Ginther*, 212 N.W.2d 922 (Mich. 1973).

[6]Brooks had testified that he had recently been convicted of receiving and concealing stolen property valued in excess of $100, but Brooks denied having any agreement with the prosecutor's office regarding his sentencing.  (TT II, 27).

-21-

THE COURT:  I think everyone is in agreement that if there had been a deal with Mr. Brooks to get a sentence reduction in exchange for his testimony at Mr. Mattox's trial, that I mean a trial would obviously be granted.

The testimony was consistent from every witness that no deal had been made with Mr. Brooks with respect to his testimony in Mr. Mattox's trial.  Ms. Emerson's I think was the strongest.  She was very straight forward and very clear that there had been no deal and that she did not believe anyone in her office would cut such a deal without informing her.

The tag upon which Defendant attempts to hang his hat in this motion is Mr. Shabluk's allocution at the September 13th, 1996 allocution in front of Judge Collette,[7] whom Mr. Brooks was being sentenced.  I believe Mr. Shabluk's testimony that he threw these remarks in because Mr. Warren told him that Mr. Brooks had been very cooperative and had testified.  Whether or not he should have verified those statements before representing them to [Judge] Collette, may be at issue -- to Judge Collette -- but I think many attorneys would rely on that kind of representation.  If I held every defense attorney who has ever appeared in front of me responsible for the truth and accuracy of statements they made during allocution on their clients' behalf, there would be very few that weren't in contempt of court.  I think Mr. Shabluk was being honest.  The prosecutor said hey he's been real helpful, he's testified on some cases, so Mr. Shabluk repeats those statements to Mr. Collette -- Judge Collette and to no avail whatsoever since Judge Collette wouldn't even honor the Kilabreu [sic] agreement.[8]

I find no basis in the record that was made today or any reason to believe that there was a secret deal, that there was a raising of expectations or that anything such occurred.  The Court denies the motion and pursuant to the order from the Court of Appeals, a transcript is to be made and filed within 21 days after today and the Court of Appeals retains jurisdiction as you both know.

(HT at 46-47).  On April 6, 1999, the trial court entered its order denying petitioner's motion for a new trial.

On December 26, 2000, the Michigan Court of Appeals issued an unpublished decision affirming petitioner's convictions.  (12/26/2000 Opinion, docket # 38).  The Court of Appeals found no merit in petitioner's argument that he had been denied a fair trial by a court ruling that precluded defense

---

[7]Attorney Jon Shabluk represented Clint Brooks in *People v. Brooks*, No. 96-70663-FH (Ingham County Circuit Court 1996).  Judge William E. Collette was the presiding judge.

[8] Judge Stell's reference was to *People v. Killebrew*, 330 N.W. 2d 834 (Mich. 1982), in which the state Supreme Court approved a process for the trial court to accept or reject certain sentencing recommendations.

counsel from arguing that petitioner's brother was the assailant. The Court of Appeals determined that

petitioner's argument was premised on a mischaracterization of the trial court's ruling:

> Defendant next contests the trial court's decision to limit defense counsel's closing argument.
>
> Defendant claims that the court's decision prevented him from arguing his theory of the case to the jury. We review a trial court's decision to limit the arguments of counsel for an abuse of discretion. *People v Buck,* 197 Mich App 404, 413; 495 NW2d 321 (1992) rev'd on other grounds 444 Mich 853 (1993); *People v Gray,* 57 Mich App 289, 295; 225 NW2d 733 (1975).
>
> In this case, defendant claims that the trial court prevented him from arguing that defendant's brother shot the victim. However, review of the transcript reveals that the trial court actually prevented defense counsel from arguing that defendant's brother broke the steering column of the vehicle involved in the crime because there was no evidence supporting counsel's argument. Based on this finding, we conclude that the court properly exercised its discretion by limiting counsel's argument to relevant matters supported by the evidence. MCR 6.414(A); *People v Ullah,* 216 Mich App 669, 679; 550 NW2d 568 (1996).

(Op. at 3-4).

It was undisputed that petitioner had stipulated to the facts that he had previously been

convicted of a specified felony and that petitioner had been not yet completed the terms of his parole on

August 21, 1995 when Michael Austin was shot. Although petitioner characterized his challenge to his

felon in unlawful possession of a firearm conviction as a challenge to the sufficiency of the evidence, the

Michigan Court of Appeals treated petitioner's claim as an instructional error claim:

> Defendant also argues that the evidence was insufficient to support his conviction of felon in possession of a firearm. The elements of felon in possession of a firearm are (1) the defendant possessed a firearm, (2) the defendant was convicted of a felony, and (3) less than five years had elapsed since the defendant served the prison term imposed for the conviction of the felony and successfully completed all conditions of parole. MCL 750.224f(2) and (6); MSA 28.421(6)(2) and (6). In this case, defendant agreed to stipulate that he had been convicted of a "specified felony" conviction and that he had not yet completed the terms of his parole. The stipulations were on the record and the prosecutor referred to the stipulations in both her opening and closing arguments, but the court did not inform the jury about the stipulations.
>
> Although defendant couched this argument as a sufficiency of evidence issue, we believe the proper analysis is that of an evidentiary or instructional error. Generally, it is the burden of the prosecution to admit sufficient evidence to prove the essential elements of the charged offenses beyond a reasonable doubt. *People v Breck,* 230 Mich App 450, 456; 584 NW2d 602 (1998).

However, in this case, the court was aware that defendant stipulated to the second and third elements of the felon-in-possession offense, yet neglected to inform the jury of the stipulation when it delivered the instructions.  Defendant does not contest the validity of the stipulation, nor does he argue that there is no evidence that supports the elements of the crime, arguing only that this evidence was not submitted to the jury.  Hence, the error in this case is more analogous to situations where the court improperly refused to admit evidence or failed to properly instruct the jury.  Errors of this nature are subject to harmless error analysis.  MCR 2.613 ; MCL 769.26; MSA 28.1096.

Under a harmless error analysis, reversal of defendant's conviction is not required unless it is more probable than not that the error was outcome determinative.  *Lukity, supra* at 495-496.  In this case, the jury convicted defendant of the felon-in-possession charge even though the court did not inform the jury of defendant's stipulation to the second and third elements of the offense.  It is apparent that the jury would have reached the same result if they had been properly instructed on the stipulation.  Because it is more probable than not that the error in failing to admit evidence of the stipulation did not affect the outcome, we will not reverse defendant's conviction.

(Op. at 2-3).

The Court of Appeals found that petitioner's challenge to the jury instruction had not been preserved for appellate review, and reviewed only for plain error.

Defendant also asserts that the trial court erred in its instructions to the jury.  This issue is not preserved for appellate review because defendant failed to object to the instructions at trial.  *People v Sardy,* 216 Mich App 111, 113; 549 NW2d 23 (1996).  Because the alleged error is unpreserved, defendant forfeited this issue unless he can demonstrate a plain error affecting his substantial rights.  *People v Carines,* 460 Mich 750, 763-764; 597 NW2d 130 (1999).

Defendant alleges the trial court erred by improperly instructing the jury on assault with intent to murder and reasonable doubt, by failing to give a limiting instruction, and by referring to "the alleged killing" instead of "the alleged assault" during the instruction on inferring state of mind.  We find no error affecting defendant's substantial rights in any of these instructions.  The trial court was not obligated to give a limiting instruction because defendant failed to request it.  MRE 105; *People v Bahoda,* 448 Mich 261, 291 n 61; 531 NW2d 659 (1995).  The court relied on standard jury instructions CJI2d 17.3 and CJI2d 3.2 to accurately state the elements of assault with intent to commit murder and adequately present the concept of reasonable doubt.  *People v Haggart,* 142 Mich App 330, 340-341, 370 NW2d 345 (1985); *People v Hubbard (After Remand),* 217 Mich App 459, 487-488; 552 NW2d 493 (1996).  While the court misspoke when it referred to the crime as the alleged killing, defendant failed to show how the misstatement affected the outcome of the proceedings.  *Carines, supra* at 763-764.  We conclude that the alleged errors do not warrant reversal of defendant's convictions.

-24-

(Op. at 4).

The Court of Appeals rejected petitioner's argument that his convictions on both the felon-in-possession and felony-firearm charges constituted a double jeopardy violation. It found that Michigan's legislature had intended the punishments reflected in petitioner's sentence:

> In this case, the statutes at issue are intended to prevent conduct that violates distinct social norms. The felony-firearm statute is intended to deter the use of firearms in the commission of a felony and reduce or prevent injury to victims, passersby, and police officers. *People v Elowe,* 85 Mich App 744, 748-749; 272 NW2d 596 (1978). The purpose of the felon-in-possession statute is to protect the public by keeping guns out of the hands of convicted felons. *People v Mayfield,* 221 Mich App 656, 662; 562 NW2d 272 (1997). Violation of the felony-firearm statute is punishable by a mandatory two-year sentence to be served consecutive to the underlying felony, while violation of the felon-in-possession statute is punishable by up to five years in prison and a $5,000 fine. MCL 750.227b; MSA 28.424(2); MCL 750.224f(3); MSA 28.421(6)(3). Finally, although both felony firearm and felon in possession are weapons offenses, the former prohibits conduct based on how the person uses the weapon, while the latter prohibits certain persons from possessing weapons. These facts make it apparent that there was no legislative intent to enact cumulative punishment for similar crimes, and defendant's convictions for both felony firearm and felon in possession do not constitute double jeopardy.

> In addition, our Supreme Court has held that double jeopardy is not implicated by a conviction for felony firearm and another felony weapon offense except one of the four felonies expressly exempted by the felony-firearm statute.[9] *People v Mitchell,* 456 Mich 693, 697-698; 575 NW2d 283 (1998). Because the felon-in-possession statute is not one of the four exempted felonies, defendant's double jeopardy challenge fails, and we conclude that defendant's convictions should not be reversed on these grounds.

(Op. at 4-5).

---

[9]According to MICH. COMP. LAWS § 750.227b(1), the expressly exempted felonies are: (1) the unlawful sale of a pistol, MICH. COMP. LAWS § 750.223; (2) carrying a concealed weapon, MICH. COMP. LAWS § 750.227; (3) unlawful possession of a pistol by a licensee, MICH. COMP. LAWS § 750.227a; and (4) altering, removing, or obliterating identifying marks on a firearm, MICH. COMP. LAWS § 750.230. *See People v Mitchell*, 575 NW2d at 285.

The Michigan Court of Appeals held that petitioner's *Batson* argument was meritless:

> Defendant first argues that the trial court erred in rejecting his challenge to the prosecutor's exercise of a peremptory challenge pursuant to *Batson v Kentucky,* 476 US 79; 106 S Ct 1712; 90 LEd2d 69 (1986). We review a trial court's *Batson* ruling for an abuse of discretion. *People v Howard,* 226 Mich App 528, 534; 575 NW2d 16 (1997). A prosecutor cannot use a peremptory challenge to strike a potential juror solely on account of the potential jurors' race. *Batson, supra* at 89; *People v Barker,* 179 Mich App 702, 707; 446 NW2d 549 (1989). The defendant has the initial burden to establish a prima facie case of purposeful discrimination by showing that he is a member of a cognizable racial group, the prosecutor used a peremptory challenge to remove a member of his race from the jury venire, and that the circumstances raise an inference that the prosecutor intended to exclude the potential juror on account of the juror's race. *Id* at 705. If defendant succeeds in establishing a prima facie case, the burden shifts to the prosecutor to show a racially neutral explanation for challenging the potential juror. *Id* at 706.
>
> In this case, we agree with the trial court's conclusion that defendant failed to establish a prima facie case of purposeful discrimination. Defendant failed to show any facts that would raise an inference of discrimination, other than the fact that both defendant and the challenged juror were black. "The mere fact that the prosecutor used one or more peremptory challenges to excuse blacks from the jury venire is insufficient to make a prima facie showing of discrimination." *People v Williams,* 174 Mich App 132, 137; 435 NW2d 469 (1989). Even if the defendant had established a prima facie case, the prosecutor offered a racially neutral reason for the challenge. Therefore, the trial court did not abuse its discretion in rejecting defendant's challenge. *Howard, supra* at 534.

(Op. at 1-2).

The Court of Appeals found that petitioner had not been deprived of a fair trial by prosecutorial misconduct:

> Defendant next asserts that he was denied a fair trial due to several instances of prosecutorial misconduct. Having reviewed the record and evaluating the challenged remarks in context, we conclude that defendant was not deprived of a fair and impartial trial. *People v Paquette,* 214 Mich App 336, 342; 543 NW2d 342 (1995). Defendant failed to preserve most of the alleged claims of error with an appropriate objection below. *People v Grant,* 445 Mich 535, 546; 520 NW2d 123 (1994). For the few instances where error has been shown, defendant failed to request a curative instruction that could have remedied any prejudicial effect. *People v Anderson (After Remand),* 446 Mich 392, 406; 521 NW2d 538 (1994); *People v. David Green,* 228 Mich App 684, 693; 580 NW2d 444 (1998). Defendant has not demonstrated that any of these errors affected the outcome of the proceedings, therefore, reversal is not warranted. *Carines, supra* at 763-764; *Lukity, supra* 495- 496.

(Op. at 5-6).

The Michigan Court of Appeals rejected petitioner's claims that the trial court's admission of various items of evidence had deprived him of a fair trial.

Defendant next argues that the trial court erred in admitting certain evidence at trial.  We review this issue for an abuse of discretion.  *People v Gould,* 225 Mich App 79, 88; 570 NW2d 140 (1997).  Defendant claims that certain documents should not have been admitted because the prosecutor violated the rules of discovery.  We conclude that defendant's argument is without merit because the court never entered an order compelling discovery, defendant did not request production of the documents pursuant to MCR 6.201(A)(5), and the documents did not constitute material exculpatory evidence.  *People v Canter,* 197 Mich App 550, 569; 496 NW2d 336 (1992).

We agree with defendant that the court abused its discretion in admitting an advertising brochure describing a device that defeated telephone bugging equipment because it was more prejudicial than probative. MRE 403.  We also agree that the cellular telephone records should not have been admitted because the records were hearsay and the prosecutor failed to establish their admissibility under MRE 803(6).  However, we conclude that the erroneous admission of the brochure and telephone records does not warrant reversal of defendant's convictions because the errors did not affect the outcome of the trial.  *People v Lukity,* 460 Mich  484, 495-496; 596 NW2d 607 (1999).

(Op. at 2).

The Court of Appeals held that Michigan's felon-in-possession statute did not violate the Equal Protection Clause:

Defendant also argues that the felon-in-possession statute violates his right to equal protection because it has a disparate impact on people of color.  Equal protection of the law is guaranteed by both the United States and Michigan Constitutions. US Const, Am XIV; Const 1963, art 1, § 2.  The guarantee of equal protection requires that the government treat similarly situated persons alike. *People v Conat,* 238 Mich App 134, 153; 605 NW2d 49 (1999).  However, the equal protection provisions of the Michigan and United States constitutions forbid only purposeful discrimination.  *Harville v State Plumbing and Heating, Inc,* 218 Mich App 302, 308; NW2d (1996).  A statute that is neutral on its face is not constitutionally invalid simply because it affects a greater proportion of one race than another.  *Harville, supra* at 306-307; *Washington v Davis,* 426 US 229, 242; 96 S Ct 2040; 48 LEd2d 597 (1976).

In order to prevail on an equal protection challenge, the party raising the challenge must show that the disputed statute has a racially discriminatory purpose.  *Conat, supra* at 153.  In this case,

defendant argues solely that the statute has a disparate impact on minority groups and does not present any evidence of a discriminatory purpose.  We conclude that defendant has failed to demonstrate that the felon-in-possession statute violates his right to equal protection of the law.

(Op. at 5).

The Michigan Court of Appeals found that petitioner's ineffective assistance of counsel claims were meritless:

Defendant also argues that he was denied the effective assistance of trial counsel.  Because defendant failed to raise this issue in a request for a new trial or a *Ginther* hearing, our review is limited to the existing record.  *People v Snider,* 239 Mich App 393, 423; NW2d (2000).  To establish a claim of ineffective assistance of counsel, defendant must show that his counsel's performance was objectively unreasonable and the representation was so prejudicial that he was deprived of a fair trial.  *People v Pickens,* 446 Mich 298, 309; 521 NW2d 797 (1994).  After reviewing the record, we conclude that the few, minor errors asserted by defendant were so not prejudicial that he was deprived of a new trial, and we will not reverse defendant's conviction on this basis.

(Op. at 6).  The Court of Appeals found that petitioner had not been deprived of a fair trial on the basis of "cumulative errors."  (*Id.*).

On February 5, 2001, petitioner filed a delayed application for leave to appeal to Michigan's Supreme Court.  Petitioner sought leave to appeal on the basis of the arguments rejected by the Michigan Court of Appeals as well as a few additional arguments never raised in the Court of Appeals.  On March 22, 2002, the Michigan Supreme Court issued an order declining leave to appeal, stating that the court was not persuaded that the questions presented should be reviewed.  (3/22/02 Order, docket # 39).

3.      **Post-conviction Proceedings**

On March 28, 2003, petitioner filed an application for post-conviction relief in Ingham County Circuit Court, claiming ineffective assistance of trial counsel on the basis of perceived

-28-

inadequacies in counsel's pretrial investigation, failure to file a motion to suppress the evidence seized from the rental car, failure to call Tammy Lee and Sabrina Mattox as witnesses, failure to object to the prosecutor's closing argument regarding the Wheeler Dealer, and the "cumulative effect" of trial counsel's errors.  Petitioner claimed due process violations in use of Clint Brooks's purportedly perjured testimony and in the prosecutor's argument relating to the testimony of Dawn Bethany.  Petitioner argued that his initial appellate counsel, Attorney Kenneth Birch, was ineffective because Birch withdrew from the appellate representation at petitioner's request and with the court's permission.  Petitioner claimed ineffective assistance of his retained appellate counsel, Attorney Linda Ashford, because she was rushed by the court's deadline for filing petitioner's brief, the issues she raised in the Michigan Court of Appeals were weak, and Ashford refused to file a supplemental *pro se* brief that petitioner had prepared or was preparing approximately three months after petitioner's appellate brief had been filed.[10]  On July 8, 2003, the trial court entered an order denying petitioner's motion for post-conviction relief, finding that petitioner "failed to show entitlement to relief as required by MCR 6.508(D)."  Petitioner filed a motion for reconsideration.  On December 30, 2003, the trial court denied petitioner's motion for reconsideration "for lack of merit," finding that petitioner "had offered no grounds for concluding that he was denied effective assistance of counsel," and "no basis for conducting a *Ginther* hearing."  The court's order further stated:

> Moreover, the issue of ineffective assistance of counsel was raised in Defendant's initial appeal and thus may not be reheard in a MRC 6.500 motion.  To the extent that Defendant asserts new claims of ineffective assistance, he has failed to show any reason for not having raised them on appeal.

---

[10] Attorney Ashford's February 16, 1998 letter responding to petitioner's request that she file a supplemental brief is Exhibit 11 attached to the petition.  The letter states in pertinent part, "Because I was retained on this case, and you are not an indigent proceeding with appointed counsel, you are not eligible to file a 'Standard 11' brief raising new issues that were not raised in our brief on appeal."  Petitioner filed a supplemental brief, and as Ashford had anticipated, it was rejected by the Michigan Court of Appeals.  (Ex. 12 to Petition).

Thus, the court is without jurisdiction to consider them.  MCR 6.508(D)(3).[11]  The motion for reconsideration must therefore be denied.

(Attachment to docket # 5).  Petitioner filed an application for leave to appeal to appeal to the Michigan Court of Appeals.  On July 15, 2004, the Michigan Court of Appeals denied petitioner's application for leave to appeal "for failure to meet the burden of establishing entitlement to relief under 6.508(D)." (7/15/2004 Order, docket # 40).  On December 29, 2004, Michigan's Supreme Court entered an order denying petitioner's application for leave to appeal because petitioner failed to meet his burden of establishing entitlement to relief under MCR 6.508(D).  The Michigan Supreme Court denied petitioner's motion for remand.  (docket # 41).  Petitioner filed his federal habeas corpus petition on March 7, 2005.

## Applicable Standards

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert. denied sub nom.*, *Texas v. Penry*, 126 S. Ct. 2862 (2006); *Slagle v. Bagley*, 457 F.3d 501, 513 (6th Cir. 2006).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  AEDPA "dictates a highly deferential standard for evaluating state-

---

[11] The trial court had "jurisdiction" to consider petitioner's post-conviction motion, but Michigan Court Rule 6.508(D)(3) states that "the court may not grant relief to a defendant if the motion . . . (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence . . . ."  Rule 6.508(d)(3) provides exceptions that permit granting post-conviction relief on a showing of "good cause" for failure to raise the ground on direct appeal and "actual prejudice," and "[t]he court may waive the 'good cause' requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime."  Mich. Ct. R. 6.508(D)(3).

court rulings which demands that state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d). Even if a state court disposes of a constitutional claim without articulating its analysis, deferential review is required. The Sixth Circuit describes the review AEDPA requires under such circumstances as "modified AEDPA deference." *Moldonado v. Wilson*, 416 F.3d 470, 475-76 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1038 (2006); *Howard v. Bouchard*, 405 F.3d 459, 467 (6th Cir. 2005). Under the modified standard, "a federal habeas court must conduct an independent review of the record and applicable law to determine whether, under the AEDPA standard, the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. The independent review, however, is not a full *de novo* review of the claims. As we held in *Harris* [*v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000)], This standard of review requires the court to conduct a careful review of the record and applicable law, but nonetheless, bars the court from reversing unless the state court's decision is contrary to or an unreasonable application of federal law." *Maldonado*, 416 F.3d at 476. *De novo* review is restricted to instances where the state court did not address the merits of a claim. In that limited set of circumstances, "there are simply no results, let alone reasoning, to which [the habeas] court can defer." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003); *Van v. Jones*, 475 F.3d 292, 293 (6th Cir. 2007); *Williams v. Anderson*, 460 F.3d 789, 796 (6th Cir. 2006); *Hill v. Mitchell*, 400 F.3d 308, 313 (6th Cir. 2005) ("[W]hen a claim has not been adjudicated on the merits in State Court proceedings, and has not been procedurally defaulted,

-31-

we look at the claim *de novo* rather than through the deferential lens of AEDPA.") (citations omitted); *Maples v. Stegall*, 427 F.3d 1020, 1025 (6th Cir. 2005).

   The AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). Section 2254(d) states that an application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Section 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning. A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than the [Supreme Court] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. at 694 (citations omitted). A federal court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from Supreme Court decisions, but unreasonably applies it to the facts of the particular case, or if the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 407; *see Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 655-56 (6th Cir. 2001).

   "It is important to note, however, that 'an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.'" *Harbison v. Bell*, 408 F.3d 823, 829

-32-

(6th Cir. 2005) (quoting *Williams*, 529 U.S. at 409). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *see Filaggi v. Bagley*, 445 F.3d 851, 853 (6th Cir. 2006); *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410; *see Bell v. Cone*, 535 U.S. at 694; *Keith v. Mitchell*, 455 F.3d 662, 669 (6th Cir. 2006) ("The proper inquiry under the 'unreasonable application' analysis is whether the state court decision was objectively unreasonable and not simply erroneous or incorrect."); *Payne v. Bell*, 418 F.3d 644, 653 (6th Cir. 2005) ("A state court decision involves an 'unreasonable application' of clearly established Supreme Court precedent when it correctly identifies the governing legal standard but applies it to the facts before it in an objectively unreasonable manner.") (citations omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This court may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *See Williams*, 529 U.S. at 381 ("If this Court has not broken sufficient legal ground to establish an asked for constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar."); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d at 943. The AEDPA standard includes an important temporal limitation. "'[C]learly established Federal law as determined by the Supreme Court of the United States,' refers to 'the holdings, as opposed to the *dicta*, of [the Supreme] Court's decisions as of

the time of the relevant state-court decision.'" *Dennis v. Mitchell*, 354 F.3d 511, 517 (6th Cir. 2003) (quoting *Williams*, 529 U.S. at 412); *see Lundgren*, 440 F.3d at 763. Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see Foley v. Parker*, 481 F.3d 380, 385 (6th Cir. 2007) ("In analyzing whether a state court decision is 'contrary to' or an 'unreasonable application' of clearly established Supreme Court precedent, a federal court may only look to the holdings of the Supreme Court's decisions as of the time of the relevant state-court decision."); *Spisak v. Mitchell*, 465 F.3d 684, 690 (6th Cir. 2006); *Miller v. Webb*, 385 F.3d 666, 672 (6th Cir. 2004) (describing the issue of whether the law was clearly established by Supreme Court precedent as a "threshold inquiry"). "'Federal Courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.'" *Payne*, 418 F.3d at 656 (quoting *Cone v. Bell*, 543 U.S. at 455). "The state court decision need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, 'so long as neither the reasoning nor the result of the state court decision contradicts them.'" *Dennis*, 354 F.3d at 517-18 (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)).

Regardless of the subsection of 2254(d) relied on by the petitioner, AEDPA requires heightened respect for state factual findings. 28 U.S.C. § 2254(e)(1); *see Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence 28 U.S.C. § 2254(e)(1); *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007); *Johnson v. Luoma*, 425 F.3d 318, 324 (6th Cir. 2005); *Lancaster*, 324 F.3d at 429. This presumption of correctness is accorded to findings of

-34-

state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Lundgren*, 440 F.3d at 763.

Applying the foregoing standards, I find that petitioner is not entitled to habeas corpus relief.

## Discussion

**A.    Sixth Amendment and Due-Process Claims Based on the Trial Court's Ruling During Closing Argument  (Ground I)**

In Ground I, petitioner argues that the trial court denied him a fair trial and "infringed" on his right to counsel when the trial court "prevented" defense counsel from arguing that Mark Mattox, petitioner's brother, had been Michael Austin's assailant.  (Petitioner's Brief, 8-14, docket # 16).[12] The Michigan Court of Appeals found this argument was premised on a mischaracterization of the trial court record.  The record shows that petitioner testified at length that he was not responsible for shooting Mr. Austin because his brother Mark Mattox was.  Defense counsel made extensive argument to the jury that this was a case of mistaken identity, and that petitioner's brother Mark Mattox had actually shot Mr. Austin.  During closing argument the trial judge made a limited ruling.  The only limitation  imposed by the judge was that petitioner's counsel could not affirmatively state that Mark Mattox had damaged the rental car's steering column, because the record was devoid of evidence supporting the argument.  (TT IV, 203-04).   Petitioner testified that he had been elsewhere, and petitioner expressly denied damaging the

---

[12] In Grounds VII, VIII, and  X, and on pages 11, 22, 23 and 30 of petitioner's brief (docket # 16), he interjects arguments that various actions violated his rights under Michigan's constitution. Alleged violations of state law do not provide a basis for federal habeas corpus relief.  *Estelle v. McGuire*, 502 U.S. 62 (1991).

car's steering column. Mark Mattox and Sabrina Johnson never testified. There was no evidence that Mark Mattox had damaged the car's steering column. The Michigan Court of Appeals held that the trial judge had properly limited defense counsel's argument to relevant matters supported by the evidence.

The Sixth Amendment, applicable to the States through the Fourteenth Amendment's Due Process Clause, guarantees a criminal defendant the right to have his attorney make a closing summation of the evidence. *See Herring v. New York*, 422 U.S. 853, 858-59 (1975). The Supreme Court's *Herring* decision emphasized that short of prohibiting closing argument altogether, trial judges retain considerable discretion in controlling the scope and duration of closing summations:

> This is not to say that closing arguments in a criminal case must be uncontrolled or even unrestrained. The presiding judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations. He may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. He may ensure that argument does not stray unduly from the mark, or otherwise impair the fair and orderly conduct of the trial. In all these respects he must have broad discretion.

422 U.S. at 862. On review, it is patent that petitioner's Ground I is premised on distortion of the underlying record. Petitioner's counsel was not "precluded" from arguing that petitioner's brother shot Mr. Austin. (TT VI, 203-04). Petitioner and his attorney made the argument. The jury rejected it. I find that the state-court determination that no Sixth Amendment or Fourteenth Amendment Due Process violation occurred easily passes muster under deferential AEDPA standards.

**B.      Sufficiency of the Evidence Supporting Petitioner's Felon in Possession Conviction (Ground II)**

Ground II challenges petitioner's conviction for being a felon in unlawful possession of a firearm. Petitioner has not disputed that his attorney and the prosecutor entered into a stipulation that

-36-

petitioner had previously been convicted of a specified felony and that petitioner had not yet completed the terms of his parole as of the date Mr. Austin was shot.  Defense counsel's reason for entering into this stipulation is obvious.  The stipulation kept from the jury the violent nature of petitioner's prior felony convictions for assault with intent to do great bodily harm less than murder and assault with a dangerous weapon (felonious   assault).  The jury was advised of the existence of the stipulation through the prosecutor's opening statement.  Petitioner now attempts to challenge the sufficiency of the evidence supporting  his felon in possession conviction on the basis that there was "no proof that he was previously convicted of the requisite specified felony."  (Petition, Attachment C, 2, docket # 1).

Given the uncontested validity of the stipulation, the Michigan Court of Appeals elected to treat petitioner's sufficiency of the evidence argument as a claim of instructional error.[13]  The appellate court found that any error in the trial court's failure to instruct the jury with regard to the stipulation was harmless because the jury would have reached the same result if they had been properly instructed.

Petitioner has not cited, and I have been unable to locate, any Supreme Court case remotely supporting petitioner's claim that he retains a right to challenge the sufficiency of the evidence supporting the jury's verdict on the basis of facts stipulated by a defendant but never read to the jury.  Every federal appellate court that has addressed the issue has held that by entering into the stipulation, a criminal defendant  waives his right to assert the government's burden of presenting evidence to the jury on the stipulated elements of the criminal offense, "including a reading of the stipulation itself."  *United States v. Harrison*, 204 F.3d 236, 240-41 (D.C. Cir. 2000); *see United States v. Hardin*, 139 F.3d 813, 816 (11th Cir. 1998); *United States v. Branch*, 46 F.3d 440, 442 (5th Cir. 1995); *accord United States v. Poulack*,

---

[13]Petitioner's claim fares no better if analyzed as an instructional error claim because procedural default would bar his claim for the reasons set forth in the discussion of Ground III.

236 F.3d 932, 938 (8th Cir. 2001) ("Because Poulack stipulated to the reduced drug quantity figure when he had knowledge that quantity was a key factor, he waived his right to a jury determination on that issue."); *United States v. Williams*, 19 F. App'x 151, 152 (4th Cir. 2001) ("[B]ecause Williams stipulated that he had been convicted of a felony and that his civil rights had not been restored, we find that the evidence was sufficient to support Williams's conviction for being a felon in possession of a firearm."). "[N]othing in either law or logic compels us to reverse a conviction when the defendant enters into a stipulation on an element and then seeks a windfall from the government's failure to formally read the stipulation to the jury." *Harrison*, 204 F.3d at 242.

Petitioner's stipulation  waived his right to challenge the sufficiency of the evidence on stipulated elements of the criminal offense of being a convicted felon who could not lawfully possess a firearm.  The decision of the Michigan Court of Appeals on this issue was not contrary to, or an unreasonable application of, Supreme Court holdings.  I find that Ground II does not provide any basis for granting federal habeas corpus relief.

## C.     Jury Instructions (Ground III)

Ground III is petitioner's claim that the trial court gave "erroneous and conflicting instructions." (docket # 1, attachment C at 3).  Petitioner argues that the jury instructions contained four defects:  (1) the instruction on the elements of assault with intent to commit murder were inadequate; (2) an instruction referred to the "alleged killing of Michael Austin"; (3) the instructions did not include a limiting instruction that petitioner's status as a felon could not be considered as evidence on Counts I and II; and (4) the judge gave the standard reasonable doubt instruction, "thereby diluting the people's burden of proof" because the instruction did not require "proof of guilt to a moral certainty."  (*Id.* at 3-4).

Respondent's answer states that all petitioner's Ground III claims of instructional error are barred by procedural default. Petitioner's brief fails to address procedural default. I find that petitioner's Ground III claims are procedurally defaulted, and that petitioner has not demonstrated cause and prejudice actual innocence.

The Michigan Court of Appeals held that petitioner's challenges to the jury instructions had not been preserved for appellate review by objection, and that petitioner had not demonstrated "plain error affecting his substantial rights." (Op. at 4) (citing *People v. Carines,* 597 NW2d 130, 138 (Mich. 1999)). The Court of Appeals found that the trial court had relied on Michigan's standard jury instructions, which accurately stated the elements of assault with intent to commit murder and adequately presented the concept of reasonable doubt. The trial court had no obligation to give a limiting instruction in the absence of a request for such an instruction. Petitioner had not demonstrated how the court's misstatement referring to "the alleged killing" instead of "the alleged assault" affected the outcome of the proceedings. None of the purported instructional errors rose to the level of plain error affecting substantial rights warranting reversal petitioner's convictions. (Op. at 4).

Petitioner's instructional error claims in Ground III are barred by procedural default, and even if the claims had not been procedurally defaulted, the instructional errors claims would not provide a basis for habeas corpus relief because petitioner has not shown that any instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

"Out of respect for the finality of state-court judgments, federal habeas courts, as a general rule, are closed to claims that state courts would consider defaulted." *House v. Bell*, 126 S. Ct. 2064, 2068 (2006). Under a long line of Supreme Court cases, an adequate and independent finding of procedural default by the state courts will also bar federal habeas review of a federal claim, unless the habeas

-39-

petitioner can show "cause" for the procedural default and "prejudice attributable thereto." *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *see House v. Bell*, 126 S. Ct. at 2076 ("As a general rule, claims forfeited under state law may support federal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error."); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Federal courts "will not take up a question of federal law presented in a case 'if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment.' The rule applies with equal force whether the state-law ground is substantive or procedural." *Lee v. Kemna*, 534 U.S. 362, 374 (2002) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). The doctrine of procedural default is applicable where petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "adequate and independent." *See White v. Mitchell*, 431 F.3d 517, 524 (6th Cir.), *cert. denied*, 127 S. Ct. 578 (2006); *Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1032 (2006). The state may assert a procedural default when the last reasoned opinion of the state courts clearly relies on a procedural bar in refusing to consider a claim. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-05 (1991). If a petitioner is guilty of a procedural default in the state courts, the federal habeas court will only entertain the defaulted issue if petitioner bears the burden of showing cause and prejudice or can show actual innocence. *House v. Bell*, 126 S. Ct. at 2076-77; *Murray*, 477 U.S. at 485; *Rust v. Zent*, 17 F.3d 155, 160-61 (6th Cir. 1994).

In this case, the Michigan Court of Appeals relied on Michigan's contemporaneous objection rule in denying petitioner's claims. It is clear that the contemporaneous objection rule was well-established at the time of petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369 (Mich. 1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee*, 534 U.S. at 385. Petitioner's  failure to comply with the state's

independent and adequate state procedural rule, *i.e.*, making a contemporaneous objection, caused him to default his claims in the state appellate court. Even though the Michigan Court of Appeals applied a plain-error review of the claimed errors to determine whether they affected the outcome, petitioner's failure to object remains a procedural default. *See White v. Mitchell*, 431 F.3d at 525; *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005), *cert. denied*, 127 S. Ct. 125 (2006); *Gultertekin v. Tinnelman-Cooper*, 340 F.3d 415, 423 (6th Cir. 2003) ("'We view a state appellate court's review for plain error as the enforcement of a procedural default.'") (quoting *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001)).

When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as result of the alleged federal violation.[14] *Coleman v. Thompson*, 501 U.S. at 750; *Murray v. Carrier*, 477 U.S. at 485; *Nields v. Bradshaw*, 482 F.3d 442 (6th Cir. 2007) ("To excuse the default for the purpose of habeas review [the petitioner] must establish both 'cause' and 'prejudice.'"); *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006); *Rust v. Zent*, 17 F.3d at 160-61. To show cause sufficient to excuse a failure to object, petitioner must point to "some objective factor external to the defense" that prevented him from raising contemporaneous objections. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991); *Lundgren v. Mitchell*, 440 F.3d 754, 763-64 (6th Cir. 2006). Ineffective assistance of counsel can constitute "cause" in the procedural default context. *See Edwards*

---

[14]"Ordinarily, violation of 'firmly established and regularly followed state rules' will be adequate to foreclose review of a federal claim. There are, however, exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. at 376. This case falls well within the general rule and outside the narrow exception recognized by the *Kemna* decision. *See* 534 U.S. at 387 (summarizing the combination of special circumstances necessary to fall within the "small category" of cases within the narrow exception to the general rule).

*v. Carpenter*, 529 U.S. 446, 451-52 (2000); *see also Broom v. Mitchell*, 441 F.3d 392, 401 (6th Cir. 2006),

*cert. denied*, 127 S. Ct. 1376 (2007). The Supreme Court emphasized in *Edwards v. Carpenter* that not

just any deficiency in counsel's performance will suffice to establish cause:

> Although we have not identified with precision exactly what constitutes "cause" to excuse procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing to preserve the claim for review in state court will suffice. Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution. In other words, ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is *itself* an independent constitutional claim.

*Edwards v. Carpenter*, 529 U.S. at 451-52. Petitioner's Traverse to Respondent's Answer claims that trial

counsel's failure to object to the jury instructions was constitutionally ineffective assistance of counsel

forming the requisite cause. (Petitioner's Traverse, 2, 15, docket # 54).[15]

To establish ineffective assistance of counsel, the petitioner must demonstrate: (1) counsel's

performance fell below an objective standard of reasonableness and was not sound legal strategy; and (2)

counsel's deficient performance prejudiced petitioner resulting in an unreliable or fundamentally unfair

outcome. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984) (citing *Michel v. Louisiana*, 350 U.S. 91,

101 (1955)). The Court indulges in "a strong presumption that counsel's conduct falls within the wide

range of reasonable profession conduct." *Id.* at 687. As for prejudice, the court focuses on whether

"counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally

unfair," *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), and "[t]he defendant must show there is a

---

[15]Petitioner's Traverse includes arguments that purported errors of appellate counsel constituted "cause." (docket # 57 at 2, 17-22). Petitioner's arguments are misplaced. Petitioner apparently lost track of the fact that he is challenging purported defects in the jury instructions, and claiming that his trial counsel failed to preserve the issue by objection. Appellate counsel obviously had nothing to do with the presence or absence of objections to the trial court's jury instructions.

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. If the defendant fails to establish either necessary prong, the court need not address the other. *See Higgins v. Renico*, 470 F.3d 624, 631 n.3 (6th Cir. 2006); *Lundgren*, 440 F.3d at 770. Petitioner's claims of ineffective assistance of trial counsel with regard to jury instructions is examined at length in the discussion of Ground VIII. For the reasons stated therein, I find that petitioner has not shown that counsel's performance fell below an objective standard of reasonableness or that counsel's purportedly deficient conduct deprived him of a fundamentally fair trial. Thus, petitioner has not established cause. Moreover, petitioner has not demonstrated prejudice. "A petitioner attacking a conviction 'must shoulder the burden of showing not merely . . . a possibility of prejudice but that [errors] worked to his *actual* and substantial disadvantage . . .'" *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)) (emphasis in original). "'[T]he prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of petitioner's guilt and a lack of evidence to support his claim.'" *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005) (quoting *Rust v. Zent*, 17 F.3d at 161-62). Here, the record contains overwhelming evidence of petitioner's guilt.

Even in the absence of a showing of cause and prejudice, a petitioner can overcome a procedural default by showing "actual innocence." *See Murray v. Carrier*, 477 U.S. 478, 496 (1986). "In the usual case the presumed guilt of a prisoner convicted in state court counsels against federal review of defaulted claims. *House v. Bell*, 126 S. Ct. at 2077. In an "extraordinary case," a compelling showing of "actual innocence" can provide a "gateway" for a federal habeas court to consider an otherwise barred claim. *Id.*, at 2076-78. To sustain this heavy burden, a petitioner must show that it is more likely than not that no reasonable juror would have convicted him absent the claimed error. *See Schlup v. Delo*, 513 U.S.

298, 326 (1995); *see also House v. Bell*, 126 S. Ct. at 2078. I find that petitioner has not demonstrated actual innocence. Therefore, petitioner's Ground III jury instruction claims are barred by procedural default.

Alternatively, even if petitioner had not defaulted his instructional error claims, the claims are clearly without merit. "The nature of the particular instruction given is a matter of state law, and we are not at liberty to grant a writ of habeas corpus simply because we find the state's decision was incorrect under state law." *Newton v. Million*, 349 F.3d 873, 879 (6th Cir. 2004); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002) ("State law means what the state courts say it means. A claim that the state court misunderstood the substantive requirements of state law does not present a claim under § 2254."). Within broad constitutional limits, a state has discretion to determine the elements of its own crimes, what proofs are essential to establish the elements of those crimes, and the available defenses. *See Patterson v. New York*, 432 U.S. 197, 210 (1977). On habeas review, the federal courts are bound by the state courts' interpretation of their own laws. *See Mullaney v. Wilbur*, 421 U.S. 684, 690-91 (1975). "The fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. at 71; *accord Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("To the contrary, we have held that instructions that contain errors of state law may not form the basis for federal habeas relief."). The question for the habeas court is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). "It must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some constitutional right." 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147). Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977); *see also Estelle v. McGuire*, 502 U.S. at 75

-44-

(erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law").

The Michigan Court of Appeals found that the reasonable doubt jury instruction was not defective. There is no clearly established Supreme Court precedent suggesting that the instruction given by the trial court was defective. Petitioner's argument that the trial judge, by giving Michigan's standard reasonable doubt jury instruction, "diluted" the prosecution's burden of proof is patently meritless. Petitioner's argument is completely undermined by the Supreme Court's decision in *Victor v. Nebraska*, 511 U.S. 1, 17 (1994). The Sixth Circuit has repeatedly held that section 3.2 of Michigan's Standard Criminal Jury Instructions, deleting the disfavored "moral certainty" terminology from its reasonable doubt instruction, satisfies the requirements of the Due Process Clause. *See Binder v. Stegall*, 198 F.3d 177, 179 (6th Cir. 1999); *Szenay v. Yukins*, No. 98-1138, 1999 WL 187482, at * 6-7 (6th Cir. Mar. 10, 1999); *accord Burton v. Bock*, 187 F. App'x 465, 467 (6th Cir. 2006); *Rogers v. Howes,* 64 F. App'x 450, 456 (6th Cir. 2003); *Shacks v. Tessmer*, 9 F. App'x 344, 351 (6th Cir. 2001). Petitioner's argument based upon the absence of the phrase "moral certainty" is meritless.

Petitioner has not identified any authority, much less clearly established Supreme Court precedent requiring the trial court to give a limiting instruction in the absence of a request for such an instruction. It was no secret that Michael Austin had died roughly a year after he had been shot. This is patent from, among other things, the testimony concerning Austin's autopsy and the removal of the bullet from Mr. Austin's spine. Petitioner's argument that the court's instruction on assault with intent to commit murder was fatally defective because it referred to the "alleged killing of Michael Austin" rather than the "alleged assault" is meritless. When the challenged instruction is viewed in context, the defect complained

-45-

of is inconsequential.  The jury instructions adequately conveyed to petitioner's jury the prosecution's burden to prove that petitioner intended to kill Mr. Austin.

In summary, I conclude that all petitioner's Ground III claims are procedurally defaulted, and that the procedural bar has not been overcome by a showing of cause and prejudice or of actual innocence.  Alternatively, I find that petitioner's claims are meritless and fail to provide a basis for federal habeas corpus relief.

## D.     Double Jeopardy (Ground IV)

Ground IV is a claim that petitioner's convictions for possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, and being a felon in unlawful possession of a firearm, MICH. COMP. LAWS § 750.224f, violate the constitutional prohibition against double jeopardy. (docket # 1, attachment C at 4-5).  Petitioner argues that in a single trial he suffered the imposition of multiple punishments for the same offense.  Petitioner's double jeopardy argument is a frequently asserted and consistently rejected issue in Michigan habeas corpus cases.  *See e.g.*, *Wright v. Jamrog*, No. 04-cv-71595-DT, 2005 WL 326544, at * 7-9 (E.D. Mich. Dec. 1, 1995); *Bonner v. Howes*, No. 04-cv-40261-FL, 2005 WL 256778, at * 3-4 (E.D. Mich. Oct. 7, 2005).  There is no basis for a contrary result in this case.

The Double Jeopardy Clause guarantees that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb."  U.S. CONST. amend. V.  The Double Jeopardy Clause is applicable to the States through the Fourteenth Amendment's Due Process Clause.  *See Monge v. California*, 524 U.S. 721, 727 (1998); *Benton v. Maryland*, 395 U.S. 784, 794 (1969).  The Double Jeopardy Clause protects  criminal defendants from:  (1) re-prosecution for the same offense after an

-46-

acquittal; (2) against prosecutions for the same offense after a conviction; and (3) against multiple punishments for the same offense. *See Ohio v. Johnson*, 467 U.S. 493, 498 (1984) (citing *Brown v. Ohio*, 432 U.S. 161, 165 (1977)). "In both the multiple punishment and multiple prosecution contexts [the Supreme] Court has concluded that where the two offenses for which the defendant is punished or tried cannot survive the 'same elements' test, the double jeopardy bar applies." *United States v. Dixon*, 509 U.S. 688, 696 (1993) (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (multiple punishment) and *Gavieres v. United States*, 220 U.S. 338, 342 (1911) (successive prosecutions). "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one [for double jeopardy purposes] is whether each provision requires proof of an additional fact which the other does not." *Blockburger*, 284 U.S. at 304. "The same elements test, sometimes referred to as the '*Blockburger*' test, inquires whether each offense contains an element not present in the other; if not, they are the 'same offense' and double jeopardy bars additional punishment and successive prosecution." 509 U.S. at 696.

The Michigan Court of Appeals did not apply the *Blockburger* test, nor was it required to do so. *See Missouri v. Hunter*, 459 U.S. 359, 368-69 (1983). However, application of the "same elements" test shows that Michigan's felon-in-possession and felony-firearm statutes are separate criminal offenses. The felon-in- possession statute states as follows:

> Except as provided in subsection (2), a person convicted of a felony shall not possess, use, transport, sell, purchase, carry, ship, receive, or distribute a firearm in this state until the expiration of 3 years after all of the following circumstances exist:
>
> (a) The person has paid all fines imposed for the violation.
>
> (b) The person has served all terms of imprisonment imposed for the violation.
>
> (c) The person has successfully completed all conditions of probation or parole imposed for the violation.

MICH. COMP. LAWS § 750.224f(1).   The most obvious element of this crime that is distinct from Michigan's felony-firearm statute is the requirement that the defendant be a "person convicted of a felony." MICH. COMP. LAWS § 750.224f(1).  The felony-firearm statute does not contain any requirement of a prior felony conviction.[16]   The felony-firearm statute is limited in scope to carrying or possessing a firearm, whereas the felon-in-possession statute prohibits the convicted felon from possessing, using, transporting, selling, purchasing, carrying, shipping, receiving, or distributing a firearm.  These two statutes easily past double jeopardy muster under the *Blockburger* test.

In *Missouri v. Hunter*, the Supreme Court observed that in the "multiple punishments" context, "the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."  459 U.S. at 366.  In *Ohio v. Johnson*, the Supreme Court explained how state statutes could fail the *Blockburger* test, yet remain perfectly valid and not violate the Double Jeopardy Clause.

> In the federal courts the test established in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), ordinarily determines whether the crimes are indeed separate and whether cumulative punishments may be imposed.  *See Albernaz v. United States*, 450 U.S. 333, 337, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981); *Whalen v. United States*, 445 U.S. 684, 691, 100 S.Ct. 1432, 1437, 63 L.Ed.2d 715 (1980).  As should be evident from our decision in *Missouri v. Hunter*, however, the *Blockburger* test does not necessarily control the inquiry into the

---

[16] Mich. Comp. Laws § 750.227b states, "(1) A person who carries or has in his or her possession a firearm when he or she commits or attempts to commit a felony, except a violation of section 223 [MICH. COMP. LAWS §750.223], section 227 [MICH. COMP. LAWS § 750.227], 227a [MICH. COMP. LAWS § 750.227a ]  or 230 [MICH. COMP. LAWS § 750.230 ], is guilty of a felony, and shall be imprisoned for 2 years. Upon a second conviction under this section, the person shall be imprisoned for 5 years. Upon a third or subsequent conviction under this subsection, the person shall be imprisoned for 10 years."  The two elements of a felony-firearm violation are: (1) the possession of a firearm; (2) during the commission of, or the attempt to commit, a felony.  *See People v. Avant*, 597 N.W.2d 864, 869 (Mich. Ct. App. 1999); *see also People v. Taylor*, No. 265778, ___ N.W.2d ___, 2007 WL 1040928, at * 1 (Mich Ct. App. Apr. 5, 2007).

intent of a state legislature.  Even if the crimes are the same under *Blockburger*, if it is evident that a state legislature intended to authorize cumulative punishments, a court's inquiry is at an end.

*Ohio v. Johnson*, 467 U.S. at 499 n.8.

The Double Jeopardy Clause's protection against multiple punishments "is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature. Because the substantive power of the states to prescribe crimes and determine punishments is vested in the legislature, the question under the Double Jeopardy Clause whether punishments are multiple is essentially one of legislative intent."  *Ohio v. Johnson*, 467 U.S. at 499; *accord Banner v. Davis*, 886 F.2d. 777, 779-80 (6th Cir. 1989).  The interpretation of state statutes and legislative intent by state appellate courts is a matter of state law which is not reviewable in habeas corpus.  *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).  "Thus for purposes of double jeopardy analysis, once a state court has determined that a state legislature intended cumulative punishments, a federal habeas court must defer to that determination." *Banner*, 886 F.2d at 780.

Here, the Michigan Court of Appeals held that the Michigan Legislature intended to permit the punishment imposed.  The felony-firearm statute is intended to deter the use of firearms in the commission of a felony and reduce or prevent injury to victims, passersby, and police officers.  (Op. at 4) (citing *People v. Elowe,* 272 N.W.2d 596, 597-98 (Mich. Ct. App. 1978)).  It prohibits conduct based on how the person uses the weapon, and violation of the felony-firearm statute is punishable by a mandatory two-year sentence to be served consecutive to the underlying felony.  MICH. COMP. LAWS § 750.227b.  By contrast, the purpose of the felon-in-possession statute is to protect the public by keeping guns out of the hands of convicted felons.  (Op. at 4) (citing *People v. Mayfield,* 562 N.W.2d 272, 275  (Mich. Ct. App. 1997).  This statute prohibits specific persons from possessing weapons.  Violation of the felon-in-

possession statute is punishable by up to five years in prison and a $5,000 fine. MICH. COMP. LAWS § 750.224f(3).  The Michigan Court of Appeals rejected petitioner's double jeopardy argument.  (Op. at 5).

The Court of Appeals found that its holding was bolstered by *People v. Mitchell,* 575 N.W.2d 283, 285 (Mich. 1998), wherein the Michigan Supreme Court held that double jeopardy was not implicated by a felony-firearm conviction and another felony weapon offense unless the later was one of the four felonies expressly exempted by the felony-firearm statute.  "Because the felon-in-possession statute is not one of the four exempted felonies, defendant's double jeopardy challenge fails, and we conclude that defendant's convictions should not be reversed on these grounds." (Op. at 5).  The Michigan Supreme Court has since definitively held that the Michigan's legislature intended to permit a defendant to be given cumulative punishments when charged with and convicted of both felon-in-possession and felony-firearm offenses.  *People v. Calloway*, 671 N.W.2d 733, 735 (Mich. 2003).  The state court decision finding no violation of the Double Jeopardy Clause easily passes review under AEDPA standards.  28 U.S.C. § 2254(d).

**E.      Jury Selection (Ground V)**

Petitioner's Ground V argument is that the trial court erred in denying petitioner's challenge to the dismissal of an African American juror pursuant to *Batson v. Kentucky,* 476 U.S. 79 (1986).  The Michigan Court of Appeals carefully examined petitioner's argument that the prosecutor had improperly exercised a peremptory challenge against an African American member of the jury venire.  The Court of Appeals held that petitioner had not carried his initial burden of establishing a *prima facie* case of purposeful discrimination, and even if petitioner had established a *prima facie* case, the prosecutor offered a racially neutral reason (the juror's  illness) for her exercise of the peremptory challenge.  (Op. at 1-2).

-50-

The trial judge had the opportunity to observe the potential juror, including the objective manifestations of his illness, and the judge's observations and conclusions are entitled to deference. *See, e.g.*, *Uttecht v. Brown*, 127 S. Ct. 2218, 2224 (2007) ("Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors" and '[t]he provisions of [AEDPA] create an independent high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings."). Petitioner has not addressed, much less carried his burden under AEDPA standards. Upon review, I find that the state-court determination on this issue did not result in a decision that was contrary to, or involve an unreasonable application of clearly established federal law as determined by the Supreme Court, nor was the decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d). Ground V does not provide any basis for granting petitioner federal habeas corpus relief.

**F.      Prosecutorial Misconduct (Ground VI)**

Ground VI consists of 11 claims of prosecutorial misconduct:

(1)   "Repeatedly" eliciting hearsay from prosecution witnesses, citing one exchange that occurred during the direct examination of Attorney Manvir Grewal (TT 85-87);

(2)   Argument "infringing" on petitioner's Fifth Amendment rights because it noted that petitioner had not identified anyone else as the assailant until he took the witness stand at trial;

(3)   Argument that the "Wheeler Dealer" was not an auto repair facility;

(4)     Suggesting that this case involved murder by eliciting that Michael Austin had subsequently died, homicide officers had investigated the incident, and using the term murder in questioning a witnesses;

(5)     Eliciting testimony that witnesses feared testifying against petitioner;

(6)     Improperly vouching for the prosecution's witnesses;

(7)     Appealing to sympathy for Michael Austin, his family, and friends;

(8)     Suggesting that petitioner had a duty to produce his wife as a witness;

(9)     Erroneously introducing other-acts evidence of petitioner's parole violations and traffic offenses;

(10)    Implying that petitioner's marital privilege should affect the jury's verdict; and

(11)    Violating the trial court's discovery order.

The Michigan Court of Appeals held that none of the purported instances of prosecutorial misconduct,[17] individually or collectively, had deprived petitioner of a fundamentally fair trial.  This state-court determination must be reviewed under the modified AEDPA deference standards.  "This standard of review requires the court to conduct a careful review of the record and applicable law, but nonetheless bars the court from reversing unless the state court's decision is contrary to or an unreasonable application of federal law [ ] as determined by the Supreme Court."  *Maldonado*, 416 F.3d at 476.

---

[17] The Michigan Court of Appeals stated that petitioner "failed to preserve most of the alleged claims of error with an appropriate objection below, and in the "few instances where error ha[d] been shown, petitioner failed to request a curative instruction that could have remedied any prejudicial effect."  (*Id.* at 5-6).  The approach taken by the Michigan Court of Appeals makes it impossible for a federal court conducting habeas corpus review to find that the state court based its denial of any specific prosecutorial misconduct claim on the basis of a procedural default.

-52-

The scope of review in a habeas corpus action of prosecutorial misconduct is narrow. "Petitioner's burden on habeas review is quite a substantial one." *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000). This court does "not possess supervisory powers over state court trials." *Id.* "It is the responsibility of the state courts to police their prosecutors; [this court has] no such authority." *Id.* "Therefore, on habeas review, our standard is limited to 'the narrow one of due process.'" *Id.* (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)); *see Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) ("'[T]he appropriate standard of review for . . . a claim [of prosecutorial misconduct] on a [petition for a] writ of habeas corpus is the narrow one of due process and not the broad exercise of supervisory power.'") (quoting *Darden*, 477 U.S. at 181). A petitioner must do more than show erroneous conduct. "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181 (quoting *Donnelly v. De Christoforo*, 416 U.S. 637, 643 (1974)). The habeas court must consider both whether the challenged conduct was improper and whether it was flagrant. *Joseph v. Coyle*, 469 F.3d 441, 473 (6th Cir. 2006). Four factors are relevant to the question whether improper conduct was so flagrant as to deny a criminal defendant a fair trial: (1) the likelihood that the remarks would mislead the jury or prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberate, or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *Id.* at 473.

1.  Hearsay Testimony

Petitioner argues that the prosecutor "repeatedly" elicited hearsay testimony from prosecution witnesses. Petitioner cites a single excerpt from the prosecuting attorney's examination of

-53-

Attorney Manvir Grewal (TT III, 85-87).  The following exchange occurred during the prosecutor's

examination of Grewal regarding telephone calls Grewal received from his partner Attorney Feinberg:

BY MS. EMERSON:

Q.     All right.  Anything about who they're obviously, at this point, the police are looking for
       suspects.

A      He also stated -- and a number of suspects were at the scene and dispersed when the person
       was shot, and they were looking for a certain number of individuals.

Q      All right.  At that point, did David [Feinberg] relay to you that it was a black male and a
       black female?

MR. COOPER:        It's like asking for hearsay, Judge.  The question is leading and it asks for
hearsay.

MS EMERSON:        Your Honor, again, it's not for the truth of the matter asserted.  I am just
asking this individual just what he believed or what kind of information he was getting back that
he believed -- not that it was true or untrue, but what kind of information David Feinberg was
passing back to him with regard to who they were looking for and how they were looking for them.

THE COURT: The objection is overruled for the following reason.  It is not hearsay, and I am
specifically instructing the jury that whether or not the police were looking for these people cannot
be proved by Mr. Grewal's statement.  Your are to consider it only within the context of what Mr.
Feinberg told him at the time, not whether Mr. Feinberg's statement was true.

BY MS. EMERSON:

Q.     Did David Feinburg relay back to you in the car that they were looking for a black male and
       a black female?

A.     Actually, he relayed they were looking for a black male and two females who left the scene.

-54-

(TT III, 85-86).   The question before this court is not whether the state-court judge committed error in finding that this testimony was not hearsay, or in not ruling on the defense counsel's objection that the question had been leading.   State-law error does not provide a basis for federal habeas relief.   28 U.S.C. § 2254(a).   Petitioner's jury was instructed that the individual or individuals the police were looking for could not be proven by Mr. Grewal's testimony, and the jury is presumed to have followed the judge's instructions.   *See Penry v. Johnson*, 532 U.S. 782, 799 (2001); *see also Cyars v. Hoffbauer*, 383 F.3d 485, 493 (6th Cir. 2004).   Petitioner has not demonstrated prosecutorial misconduct.   The state court determination that this exchange did not deprive petitioner of a fundamentally fair trial certainly passes muster under the applicable standards of review.

2.   Rebuttal Argument "Infringing" on Petitioner's Fifth Amendment Rights

Petitioner's entire argument with regard to this claim is set forth below:

Defense counsel argued there was evidence that petitioner's brother Mark Mattox was the shooter, but the police did not investigate that possibility.   The prosecutor responded by arguing: "The Defendant, who was at the preliminary examination in July and knowing that he's facing trial, came and told you today that he's now claiming it's his brother."   (TT IV) 21[3]; 11/8/96).

(docket # 1, attachment C at 6).   The brief submitted in support of the petition makes a passing reference to this claim of error (docket # 16 at 20), but adds nothing of substance.

Petitioner is correct that the one-sentence excerpt selected from the prosecutor's rebuttal argument came directly in response to defense counsel's argument the police investigation had been inadequate.   Defense counsel did not object to this rebuttal argument.   The  rebuttal argument was that police should not be faulted for their failure to focus on Mark Mattox as a suspect because not one witness came forward with statements or evidence suggesting that petitioner's brother should be considered a

suspect.  Petitioner had moved, lived under a false identity, and deliberately kept a pivotal witness away from the police.

In *Doyle v. Ohio*, 426 U.S. 610 (1976), the Supreme Court considered the use of post-arrest silence against a criminal defendant.  The Court's subsequent decision in *Greer v. Miller*, 483 U.S. 756 (1987), summarized *Doyle*'s facts as follows:

> The petitioners in *Doyle* were arrested for selling marijuana. They were given *Miranda* warnings and made no postarrest statements about their involvement in the crime.  They contended at trial that they had been framed by the government informant.  As part of his cross-examination, the prosecutor repeatedly asked petitioners why, if they were innocent, they did not give the explanation that they proffered at their separate trials to the police at the time of their arrest.  Defense counsel's timely objections to this line of questioning were overruled.  Also, over timely objections, the trial court allowed the prosecutor to argue petitioner's postarrest silence to the jury.

*Greer*, 483 U.S. at 761-62 (footnote and citation omitted).  In *Doyle*, the Court held that "while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings."  *Doyle*, 426 U.S. at 618.  The Court in *Doyle* found that the petitioners' due-process rights under the Fourteenth Amendment had been violated.  Here, the prosecutor never argued that petitioner's post-arrest silence was evidence of petitioner's guilt.  The prosecutor argued, in rebuttal to the accusation that the police had been inept, that the police could not reasonably be faulted for failure to focus on Mark Mattox as a suspect because there was no evidence available to the police before trial indicating that Mark Mattox had been involved in the shooting, and that petitioner had admittedly obstructed the police investigation by hiding the whereabouts of a key witness.  The prosecutor's rebuttal argument did not use petitioner's post-arrest silence against petitioner within the meaning of *Doyle*.  *See Greer*, 483 U.S. at 765 n.5; *accord United States v. Weinstock*, 153 F.3d 272, 279-80 (6th Cir. 1998).  The state-court determination that this rebuttal argument did not deprive petitioner of

-56-

a fundamentally fair trial was not an unreasonable application of clearly established United States Supreme Court precedent.

        3.     <u>Rebuttal Argument Regarding the Wheeler Dealer</u>

Petitioner argues that he testified that the Wheeler Dealer was an auto repair business and that, "in closing argument, the prosecutor contested petitioner's testimony on this issue, asserting that the Wheeler Dealer was not an automotive shop but was instead a newspaper "that prints up adds in the community." (docket # 1, attachment C at 7). Petitioner's argument is trivial. When viewed in context, the point of the prosecutor's rebuttal argument was not to challenge petitioner's characterization of the nature of the Wheeler Dealer's business, but to respond to defense counsel's argument that petitioner's testimony had been "too detailed" to have been false:

> Now I'd like to discuss some of the inconsistencies of Defendant's testimony. First of all, Defense argues that it must be true, Defendant's version, or you couldn't get all that kind of detail. Well, one of the details that he gave you quite a bit about was the fact that the newspaper, the Wheeler Dealer, that prints up ads in our community, is an automotive shop.

> He spent 15, 20 minutes there and went there repeatedly with his father-in-law to get a car fixed. Well, you certainly can make up all kinds of details; you're not always right, but you certainly can make them up.

(TT IV, 215-16). There was nothing improper in rebuttal argument that the defense's assertion that petitioner's testimony had been too detailed to have been false was a fallacy. The state court determination that there was no prosecutorial misconduct depriving petitioner of a fundamentally fair trial easily passes review under the applicable standards.

4.      "Erroneously Suggesting that This Case Involved 'Murder'"

Petitioner's next claim of prosecutorial misconduct is that the prosecutor committed misconduct by suggesting to the jury that the case involved a murder through the following conduct:

(1)     alluding to Michael Austin's death in her opening statement (TT I, 34);

(2)     eliciting testimony from Detective Owen Deatrick that he was a homicide detective assigned to work a homicide or shooting (TT IV, 21-22), that Deatrick believed Mr. Austin may have been dying on the date Austin was shot in the face, and that Deatrick made the arrangements for Austin's autopsy (TT IV, 37);

(3)     eliciting testimony from Detective Michael Debnar that he was a homicide detective (TT IV, 58) and that Debnar was present during Austin's autopsy and took custody of the bullet removed from Austin's neck (TT IV, 67-78);

(4)     questioning Clint Brooks about the shooting; and

(5)     mentioning Austin's autopsy in closing argument (TT IV, 174).

Petitioner was not charged with murder and was not convicted of murder. Michael Austin's death occurred approximately a year after the August 21, 1995 shooting.[18] The bullet that had been lodged in Mr. Austin's spine was removed after his death. If petitioner had not purposefully evaded arrest, thereby postponing his trial, Mr. Austin might well have been alive during petitioner's trial. There was no legal basis for keeping the fact of Mr. Austin's death from the jury. The prosecutor's questions or argument

---

[18] Michigan has abrogated the common law "year-and-a-day rule," pursuant to which a death occurring more than a year and a day after an injury was conclusively presumed not to have been caused by the injury. *People v. Stevenson*, 331 N.W.2d 143 (Mich. 1982).

did not constitute misconduct, much less misconduct that could possibly have deprived petitioner of a fair trial.

5.    Eliciting Testimony from Witnesses that They Were Afraid of Testifying Against Petitioner

Petitioner argues that the prosecutor committed error by eliciting testimony from Clint Brooks on redirect examination about Brooks's concerns for his safety.  During cross-examination defense counsel had questioned Mr. Brooks about a conversation Brooks had in jail with inmate Dewayne Dawson. Brooks denied telling Dawson that police were pressuring him to testify against petitioner and denied telling Dawson that he had not seen the shooter's face.  Brooks testified that after this conversation with Dawson, he and Dawson had been separated.  (TT II, 51).  During the redirect examination which immediately followed, the prosecutor inquired whether Brooks had "some concern" offering testimony against petitioner.  Brooks responded that he was concerned that his life was in danger in jail.  Brooks testified that he had been involved in an argument with another inmate, and it resulted in death threats and Brooks being moved to a maximum security area of the jail.  (TT II, 53).  Brooks testified that he had not discussed petitioner's case with any other inmate, and that if he had been asked about the case by another inmate, he would not have discussed his intended trial testimony.  (TT II, 54).

There was nothing improper in this line of rebuttal questioning of Mr. Brooks.  It came in anticipation that the defense might elect to call Mr. Dawson as a witness.  The questioning also went to the issue of Brooks's credibility.  Defense counsel's cross-examination sought to emphasize the pressure police had placed on Brooks to testify against petitioner.  The rebuttal questioning simply sought to establish that this witness believed that offering testimony was a serious act, not to be undertaken lightly

given the real potential for physical harm inflicted by other prisoners.  The prosecutor's questioning never implied that petitioner had threatened Brooks.  In fact, upon recross-examination, Brooks expressly denied having any contact with petitioner inside the jail.  (TT II, 59).  Petitioner has not demonstrated any prosecutorial misconduct, much less misconduct that deprived him of a fundamentally fair trial.

Petitioner also objects to testimony the prosecutor elicited from Dawn Bethany.  Ms. Bethany testified that she was a resident of the Hickory Woods Apartments as of the date Mr. Austin was shot.  She initially testified that the man who shot Mr. Austin was not present in the courtroom.  When asked if she was afraid of testifying Ms. Bethany responded, "There's always a fear of someone coming after you for what you may do or say.  There's things like that that happen all the time, but it would not make me say something that was not true." (TT II, 73).  Later, when recalled to the witness stand, Bethany testified that her initial testimony had been false.  She testified that she had given false testimony because she feared for the safety of her five-year-old son.  Ms. Bethany testified that she saw petitioner shoot Mr. Austin.  (TT III, 28-30, 32).  The prosecutor's questioning of this witness with regard to her reason for previously committing perjury was unobjectionable.  The state-court finding of no constitutional violation in this regard easily passes muster under the modified AEDPA deference standards.

6.   Vouching for Prosecution Witnesses

Petitioner argues that the prosecutor vouched for the credibility of the prosecution's witnesses and thereby deprived him of a fair trial.  Petitioner's argument emphasizes only the italicized portions of the prosecutor's closing argument, quoted in context below:

Unfortunately, none of this works for the Defendant because there are four eye witnesses, and each and every one of the eye witnesses, whether they knew Michael Austin or whether they

-60-

didn't, whether they had nothing to do with Michael Austin or whether they were in love with Michael Austin, every one of them says it was the defendant.

Now, granted, Dawn Bethany first said it was not, but I believe that all of you had an opportunity to look at her on Tuesday and to look at her on Thursday. And I believe there's evidence on this record that she is credibly and visibly scared.

This is a person who would shoot a man in the face on a second attempt over some ladies haggling. That's a scary thing to witness, and it's a scary thing to know that there's a man out there that will shoot you for a lot less than coming to court and testifying that the Defendant's the shooter.

She told you -- she told you she felt bad. She told you she was a woman who felt like she had sinned and that it was wrong to have lied in court. *She told you why she lied. She was credible.* She's corroborated by every other witness that was testifying here and that was an eye witness to the scene, and she's corroborated by the fact that the car was in fact a mile away from where they find the Defendant with the person they say the Defendant is with.

* * *

So if you wonder whether he had Fila thongs on or flip-flops or if you wonder if he had tennis shoes and you get hung up on that, remember it's not an element. We don't have to prove the color of shoes. In fact, I suggest to you that most of those witnesses there witnessing the brutal act of the Defendant on that particular day were focused on the gun, the victim and the brutal act.

I would suggest to you that to the extent that there are differences in the clothing and differences in height and weight and all that, the people and the focus was on the brutality and on the injury and not on the details, although *I think* the witnesses did a fairly decent job of testifying with regard to who they believe it is and being positive as to who did it.

(TT IV, 176-78).

The threshold question in habeas corpus analysis is whether the due-process right relied upon by petitioner has been clearly established by decisions of the United States Supreme Court. 28 U.S.C. § 2254(d). I find that it has not. Although the Court has recognized that certain prosecutorial misconduct, if severe and pervasive, can violate the Due Process Clause, *see, e.g., Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (presentation of knowingly false testimony), the Supreme Court has never condemned under due-process principles prosecutorial "vouching." The Court's only occasion to opine in this area arose in a federal prosecution in which the prosecutor shared

-61-

with the jury his "personal impression" that the defendant intended to commit fraud.  *United States v. Young*, 470 U.S. 1 (1985).  Examining the totality of the proceedings, the Court refused to find that the prosecutor's remark constituted plain error.  In reaching this conclusion, the Court said that a prosecutor violates rules of professional conduct by expressing his personal belief as to the truth or falsity of any testimony or evidence of the guilt of the defendant.  470 U.S. at 7.  The Court nevertheless refused to find plain error.  Two observations must be made concerning the sufficiency of the *Young* decision to satisfy AEDPA's requirement that a constitutional right be clearly established by holdings of the Supreme Court.  First, the *Young* Court was not engaged in constitutional adjudication, but was merely reviewing a federal trial for the presence of plain error.  The Court did not cite the Due Process Clause or any of its cases decided thereunder.  Although the Court said that vouching can be unprofessional, it has never said that vouching is unconstitutional.  Second, the Court's comments concerning this particular species of prosecutorial misconduct were clearly *dictum*, as the Court went on to hold that the prosecutor's error, whatever it may have been, did not affect the fundamental fairness of the trial.  470 U.S. at 20.  Consequently, petitioner cannot point to any Supreme Court holding that condemns under federal constitutional principles comments by the prosecutor that may be construed as expressing a personal opinion concerning witness credibility.

The lower federal courts have generally condemned vouching by the prosecutor, and often analyze the issue under federal due-process principles.  *See, e.g., Washington v. Hofbauer*, 228 F.3d 689, 700-01 (6th Cir. 2000).  Lower federal courts have generally recognized two types of objectionable vouching.  The first type impermissibly places the government's prestige behind the witness to bolster the witness's credibility.  *See United States v. Jackson*, 473 F.3d 660, 670 (6th Cir.), *cert denied*, 127 S. Ct. 2294 (2007); *United States v. Trujillo*, 376 F.3d 593, 607 (6th Cir. 2004).  In the second type of

-62-

impermissible vouching, also known as "bolstering," the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, justifying the prosecutor's belief in the defendant's guilt.  *See United States v. Jackson*, 473 F.3d at 670; *United States v. Owens*, 426 F.3d 800, 807 (6th Cir. 2005), *cert. denied*, 126 S. Ct. 1089 (2006).  As previously noted, however, the district court may not refer to decisions of lower federal courts in determining whether the state courts have issued a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  *See Williams v. Taylor*, 529 U.S. at 412.  In the present case, it is impossible to point to a Supreme Court decision that clearly establishes the principle that remarks of the prosecutor commenting on credibility violate the federal Due Process Clause.  Petitioner's argument therefore falters at the first step of analysis under AEDPA.

Even if this court were to refer to lower federal court decisions, no impermissible vouching occurred in this case.  Dawn Bethany had lied under oath, either when she initially testified or when she was recalled as a witness and identified petitioner as the man who shot Michael Austin.  The prosecutor did not vouch for the witness by saying that she found her credible.  Rather, she said that the witness was credible because her version was corroborated by the other eyewitnesses.  A prosecutor is allowed to assert reasons for believing or disbelieving a witness.  *See Bates v. Bell*, 402 F.3d 635, 646 (6th Cir.), *cert. denied*, 126 S. Ct. 163 (2005); *Greer v. Mitchell*, 264 F.3d 663, 683 (6th Cir. 2001).

Although the transcript shows that the prosecutor used the phrase, " I think," when viewed in context, the prosecutor's comment was isolated, and her argument was that eyewitness testimony does contain and should reasonably be expected to contain minor inconsistencies.  *See Joseph v. Coyle*, 469 F.3d 441, 474 (6th Cir. 2006) (Although the prosecutor repeatedly prefaced his statement with "I believe" or "I think," his actions did not rise to the level of a due process violation.); *see also Slagle*, 457 F.3d at 522-

23.  The prosecutor's comments did not suggest that she had secret knowledge of facts bearing on the credibility of the witnesses.  This sort of comment does not constitute prosecutorial misconduct.  This isolated use of the term "I think" cannot be considered flagrant or prejudicial.  *Joseph*, 469 F.3d at 474.

Consequently, even assuming a constitutional right cognizable on habeas corpus review under AEDPA standards, the decision of the Michigan courts cannot be deemed contrary to any such right. The purported instances of "vouching" were isolated and apparently inadvertent.  The Michigan Court of Appeals held that none of the purported instances of vouching, collectively or individually, deprived petitioner of a fundamentally fair trial.  This determination easily passes muster under the modified deference standard of review under AEDPA.

7.  Appealing for Sympathy for Michael Austin, His Family, and Friends

Petitioner argues that two excerpts from the prosecutor's closing argument constituted improper appeals to the jury for sympathy such that petitioner was deprived of a fundamentally fair trial. Petitioner first objects to the portion of the prosecutor's argument stating that the shot to Michael Austin's face immediately left him a quadriplegic, unable to eat, breathe or have bowel movements in a normal fashion.  (TT IV, 174).  These physical consequences of the gunshot to Mr. Austin's head are undisputed. Plaintiff has not cited any authority remotely suggesting that the prosecutor is precluded from arguing the fact of the victim's injuries to the jury.

The second excerpt petitioner challenges is selected from the prosecutor's rebuttal argument, where in response to defense counsel's arguments attacking the prosecutor as the government's attorney, the prosecutor stated the unremarkable proposition that the government  serves the people of

-64-

Michigan, and represents the interests of everyone in the community, including Michael Austin's mother, family, and friends:

> First you're told, theme number one, is that mean old Government interference, and they have [sic] presented to you bad witnesses and they've interfered with the evidence.

> First of all, we represent the people of the State of Michigan; it's not a machine. Part of the people of the State of Michigan include Michael Austin's mother and family and friends. It certainly includes everyone in the community.

> We do not pick and choose our witnesses.

(TT IV, 211). There was no objection to this rebuttal argument because it was unobjectionable. A habeas petitioner must do more than criticize a prosecutor's conduct. "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. at 181. The challenged portions of the prosecutor's closing arguments were brief and not inflammatory -- particularly not for a case involving the charge of assault with intent to murder involving a gunshot to the victim's face at close range. The argument was not likely to prejudice the jury. The trial court instructed the jury that it should be guided only by the evidence and that the attorneys' closing arguments were not evidence. (TT IV, 37-38). The jury is presumed to have followed the instructions.

The Supreme Court has never found prosecutorial misconduct, much less prosecutorial misconduct rising to the level of a due-process violation, based upon even remotely similar circumstances. Although a habeas court must be guided by Supreme Court precedent, decisions of the United States Court of Appeals are also instructive. The cases in which the Sixth Circuit has found prejudicial prosecutorial misconduct have involved much more egregious and pervasive attempts to evoke sympathy. In *United*

-65-

*States v. Payne*, 2 F.3d 706, 711-15 (6th Cir. 1993), the court reversed a federal conviction because of the prosecutor's repeated references to Christmas time, poor pregnant women, and employee layoffs, finding that the prosecutor's statements were part of a "calculated effort to evoke strong sympathetic emotions" for victims and against the defendants. Similarly, in *Martin v. Parker*, 11 F.3d 613 (6th Cir. 1993), the court condemned the prosecutor's repeated references to the defendant as a "Hitler," a dictator," a "disturbed individual," and "one of the most obnoxious witnesses you'll ever hear." 11 F.3d at 616; *accord United States v. Steinkoetter*, 633 F.2d 719, 720-21 (6th Cir. 1980) (prosecutor's comparison of defendant to Pontius Pilate and Judas Iscariot require reversal). By contrast, the prosecutor's remarks in the present case were not inflammatory. As the Sixth Circuit has observed, it is impossible to expect that a criminal trial will be conducted without some showing of feeling. "'The stakes are high, and the participants are inevitably charged with emotion.'" *Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir. 1990) (quoting *United States v. Wexler*, 79 F.2d 526, 529-30 (2d Cir. 1935)). The state-court determination that the prosecutor's comments in the present case did not so infect the trial with unfairness as to make the resulting conviction a denial of due process easily passes review under the modified AEDPA deference standards.

8.    Suggesting that Petitioner Had a Duty to Produce His Wife as a Witness

The eighth claim of prosecutorial misconduct is that petitioner was somehow deprived of a fundamentally fair trial by argument that "erroneously suggested" that petitioner had a duty to produce his wife as a witness. The prosecutor never argued that petitioner had a duty to present testimony from his wife. Sabrina Johnson never appeared as a witness. Police were unable to locate Sabrina Johnson before and during petitioner's trial. Petitioner admitted taking affirmative steps to conceal Sabrina Johnson's

whereabouts from the police and preventing her from discussing the shooting with the police.  The point of the prosecutor's argument was that petitioner's testimony was completely devoid of support.  No witness, other than petitioner himself, had offered testimony supporting  petitioner's version of events.  There was nothing improper in the prosecutor's argument.   There was no due process violation.

> 9.     Erroneously Introducing Other-Acts Evidence

The ninth claim of prosecutorial misconduct is set forth verbatim below:

On cross-examination, the prosecutor elicited that when Petitioner flew to Atlanta to Marry Sabrina Johnson he had violated his parole; that his driver's licence had been suspended in 1995-1996; and he was driving on a restricted license.

(docket #1, attachment C, at 12).  Petitioner's direct testimony had emphasized his need to comply with the terms of his parole, particularly his need to get to Detroit on the afternoon of August 21, 2005, for a meeting with his  parole officer.  This was offered as justification for a series of actions petitioner claimed to have taken on the day Mr. Austin was shot.  Petitioner having offered this direct examination testimony, the prosecutor's relatively brief cross-examination regarding petitioner's out-of-state travel in apparent violation of the terms of his parole was unobjectionable.  The brief cross-examination concerning the status petitioner's driver's license was likewise unobjectionable.  Furthermore, it is difficult to discern how the jury's knowledge that petitioner had a restricted driver's license would result in any prejudice, much less deprive him of a fundamentally fair trial.

10.    Implying that Petitioner's Marital Privilege Should Affect the Jury's Verdict

Petitioner's tenth claim of prosecutorial misconduct is that the prosecutor implied that petitioner's marital privilege should affect the jury's verdict. This argument is frivolous and based on a gross distortion of the record. The prosecutor never implied that the jury should find him guilty because he or his wife invoked state-law marital privilege. Marital privilege was never invoked by any witness. Therefore, it was never necessary for the court to determine whether petitioner had waived his state-law privilege by his partial disclosure of otherwise protected marital communications with Sabrina Johnson.[19] Sabrina Johnson never had an opportunity to invoke a state-law marital privilege against disclosure of confidential communications with petitioner, because the authorities were never able to locate Sabrina Johnson. In rebuttal argument, and in direct response to defense counsel's argument that petitioner was somehow attempting to protect his wife from testifying by concealing her whereabouts, the prosecutor made a single, brief reference to marital privilege. (TT IV, 217). Defense counsel objected, the court instructed the prosecutor to proceed without arguing privilege, and the prosecutor complied with the judge's directive. (*Id.*). The isolated reference to marital privilege by the prosecutor did not deprive petitioner of a fundamentally fair trial.

11.    Violation of the Trial Court's Discovery Order

Petitioner's eleventh claim of prosecutorial misconduct requires little discussion. The trial court found no violation of a discovery order. The Michigan Court of Appeals agreed. These factual

_____

[19] I assume for present analytical purposes that petitioner did marry Sabrina Johnson. However, there is little if anything in this record other than petitioner's testimony to establish the existence of a marital relationship. There is no privilege in the absence of a marital relationship.

-68-

findings cannot be disturbed except by clear and convincing evidence.  28 U.S.C. § 2254(e).  This argument does not provide any basis for disturbing his convictions under modified deference AEDPA standards.

In summary, the state court determination that these alleged instances of prosecutorial misconduct, individually and collectively, did not deprive petitioner of a fundamentally fair trial easily withstands scrutiny under the applicable standards.

## G.    Equal Protection (Ground VII)

Ground VII is petitioner's claim that Michigan's statute prohibiting a convicted felon from possessing a firearm, MICH. COMP. LAWS § 750.224f, violates the Equal Protection Clause.  The Michigan Court of Appeals held that Michigan's facially neutral felon-in-possession statute did not violate the Equal Protection Clause.  Petitioner failed to show that Michigan's statute had a discriminatory purpose. Petitioner's espoused belief that this statute had a disparate impact because a greater portion of African Americans had felony convictions failed to undermine the statute's validity.  (Op. at 8) (citing *Washington v. Davis,* 426 U.S. 229, 242 (1976)).  Petitioner has not shown that this determination  was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, which has never issued an opinion remotely supporting petitioner's argument.

## H.    Ineffective Assistance of Trial Counsel (Ground VIII)

Ground VIII consists of 13 claims of ineffective assistance of trial counsel.  (Petition, Attachment C, 14-25, docket # 1; Petitioner's Brief, 23-30, docket # 16).  Although petitioner  faced a

significant hurdle under the *Strickland* standard in state court on his claims of ineffective assistance of

counsel, he now faces an even higher hurdle under AEDPA standards:

> To prove ineffective assistance of counsel, a petitioner must show deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Strickland* requires that reviewing courts be highly deferential of counsel's performance. *Id.* at 689, 104 S.Ct. 2052. Counsel renders ineffective assistance when his performance "f[alls] below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. 2052, but there is a "strong presumption" that counsel's performance was professionally reasonable, *id.* at 689, 104 S.Ct. 2052. Prejudice requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. Although this is a high burden for a petitioner to satisfy, it is even higher for a petitioner proceeding under the AEDPA:

> > For [a petitioner] to succeed, ... he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly. Rather, he must show that the [state] Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

*Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006) (quoting Bell v. Cone, 535 U.S. 685, 698-99 (2002).

Here, the Michigan Court of Appeals, applying the *Strickland* standard,[20] held that no Sixth Amendment

violation had occurred. (Op. at 6). Because the state court disposed of petitioner's ineffective assistance

of counsel claims without articulating its analysis other than stating that the errors asserted by petitioner

were "few" and "minor," and petitioner had suffered no prejudice as a result of counsel's actions (*Id.*), this

court must apply the "modified AEDPA deference" standard. *See Moldonado*, 416 F.3d at 475-76. The

court "must conduct an independent review of the record and applicable law to determine whether, under

---

[20]The Michigan Court of Appeals cited *People v. Pickens*, 521 N.W.2d 797, 802 (Mich. 1994), which in turn cites *Strickland*.

the AEDPA standard, the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented." It is not *de novo* review, and AEDPA "bars the court from reversing unless the state court's decision is contrary to or an unreasonable application of federal law." *Id.* at 476.

       1.    <u>Inadequate Impeachment of Stacy Mezo</u>

       Petitioner argues that his trial counsel failed to adequately impeach Stacy Mezo with her preliminary examination testimony. (docket # 1, attachment C at 14). Petitioner cites only a selective portion of the preliminary examination transcript ("PE," docket # 30) in support of this argument. She testified at the preliminary examination that she saw petitioner and Mr. Austin standing within arm's length from each other. She saw Mr. Austin knock away petitioner's arm and she saw that petitioner had a gun in his hand. She testified that she saw sparks from petitioner's gun in one portion of her testimony (PE, 14, 22-23), and in another indicated that she looked away for a few seconds and heard two gunshots and then she saw petitioner and Sabrina running away immediately after the shots were fired. (PE, 9-16, 24-25). Petitioner never claimed that he shot Michael Austin in self-defense. There were only two men in the area, and one of them was the victim, Mr. Austin. Defense counsel wisely avoided focusing his cross-examination of Ms. Mezo on whether Mezo actually saw petitioner's gun discharge directly into Mr. Austin's face. Petitioner's proffered defense was mistaken identity. Defense counsel's cross-examination utilized Mezo's preliminary examination testimony and Mezo's statement to the police and emphasized Mezo's limited opportunity to view the gunman and how Mezo's description to the police suggested a gunman taller and heavier than petitioner. (TT II, 142, 149-50, 163-66, docket # 33). The state-court's finding of no Sixth Amendment violation easily passes review under applicable standards.

2.    Failure to Present Expert Testimony on Identification or Seek Jury Instructions
Based on *People v. Franklin Anderson*

Petitioner's next claim of ineffective assistance of counsel is that his trial counsel was constitutionally ineffective in failing to present expert testimony on identification or seeking special jury instructions on the basis of *People v. Anderson*, 205 N.W.2d 267 (Mich. 1973), *overruled by*, *People v. Hickman*, 684 N.W.2d 267 (Mich. 2004).  Petitioner cites no Supreme Court authority, or for that matter any authority, supporting his argument that his attorney was constitutionally ineffective for failure to call an expert witness "on identification."  Petitioner simply favors the court with a laundry list of perceived inconsistencies in witness testimony.  Petitioner has not established the substance of any identification expert's testimony.  Any such expert that had been called would have been hard pressed to explain away the consistent testimony offered by multiple witnesses identifying petitioner as the man who shot Michael Austin.

The *Anderson* decision has been overruled.[21]  The  Court of Appeals rejected petitioner's argument that his trial counsel was constitutionally ineffective for failing to request a special jury instruction on the basis of  *Anderson* to advise jurors "that even well-meaning witnesses may sincerely

---

[21]In *Moore v. Illinois*, 434 U.S. 220 (1977), the Supreme Court recognized that the Sixth Amendment right to counsel attaches only to corporeal identifications conducted at or after the initiation of adversarial criminal proceedings.  The Michigan Supreme Court had issued a contrary opinion three years earlier in *People v. Anderson*, 205 N.W.2d 461 (Mich. 1973).  The Michigan Supreme Court recently held that to the extent that *People v. Anderson* went beyond the constitutional text and extended a right to counsel before the initiation of adversarial criminal proceedings, it is overruled.  *See People v. Hickman*, 684 N.W.2d 267, 268 (Mich. 2004).  The Michigan Supreme Court admitted, "the *Anderson* rules lack[ed] a foundation in any constitutional provision, whether state or federal."  684 N.W.2d at 269.  The attempt to rationalize the rules as an exercise of the court's authority to promulgate rules of evidence was "unpersuasive."  *Id.*  "The rules encompassed more than purely evidentiary matters, and the rationale underlying them ha[d] been disapproved in *Moore*."  684 N.W.2d at 269.

believe in the identifications they make, and yet be completely wrong." (Defendant-Appellant's Brief at 39-40, found in the record of the Michigan Court of Appeals, docket # 38). The trial transcript shows that petitioner's jury was instructed in accordance with Michigan's standard civil jury instruction 3.6 regarding potentially erroneous witness testimony: "People see and hear things differently, and witnesses may testify honestly but simply be wrong about what they saw or remembered." (TT IV, 230, docket # 35). The decision of the Michigan Court of Appeals finding no constitutional violation easily passes review under deferential AEDPA standards.

3.    Failure to Seek a Lineup

The Michigan Court of Appeals held that petitioner's trial counsel was not constitutionally ineffective for failure to request a lineup. Eyewitnesses identified petitioner at trial. There is nothing in the record suggesting that witnesses would not have likewise identified petitioner from a lineup. Petitioner's argument does not provide a basis for habeas corpus relief. 28 U.S.C. § 2254(d).

4.    Failure to Move to Suppress the Evidence Seized By Police

Petitioner claims ineffective assistance of trial counsel in counsel's failure to file a motion suppress the evidence the police seized from the rental car. Petitioner has not identified any legal or factual basis for such a motion. It is undisputed that the police found the car abandoned in a field. Petitioner had no reasonable expectation of privacy in the abandoned vehicle. *See, e.g.*, *United States v. Gillis*, 358 F.3d 386, 391-92 (6th Cir. 2004); *United States v. Oswald*, 783 F.2d 663, 666 (6th Cir. 1986). Petitioner's counsel was not required to file a patently meritless motion to suppress. The state court determination finding no Sixth Amendment violation easily passes habeas corpus review.

-73-

5.    Failure to Move to Suppress Evidence on the Basis that Petitioner's Arrest
      Warrant and Arrest had been Invalid

Petitioner argues that his trial counsel was constitutionally ineffective for failure to argue that the warrant for petitioner's arrest was invalid.[22]   Petitioner offers no authority in support of this argument, only his conclusion that the testimony offered in support of the arrest warrant was insufficient. Petitioner's argument fails to establish a basis for federal habeas corpus relief.

6.    Failure to Call Dewayne Dawson as a Witness

Petitioner's sixth claim of ineffective assistance of counsel is that counsel was constitutionally ineffective because Dewayne Dawson was not called as a witness.  Petitioner presents his argument in these terms:

> Before trial Petitioner had notified his trial counsel that Dewayne Dawson had heard Clin[t] Brooks state that he could not identify Petitioner.  Brooks told Dawson the police had pressured him and promised him that he would not be exposed to habitual charges if he would identify petitioner as the assailant.  Dawson signed an affidavit to that effect.

_____

[22] Under the *Kerr-Frisbie* doctrine, however, the power of a court to try a person is not impaired by any defect in the arrest warrant or the method of bringing the person before the court. *See Frisbie v. Collins*, 342 U.S. 519 (1952); *Kerr v. Illinois*, 119 U.S. 436 (1886).  The Supreme Court has consistently applied this doctrine in holding that an illegal arrest does not void a subsequent conviction.  *See Gerstein v. Pugh*, 420 U.S. 103, 118-19 (1975); *see also United States v. Crews*, 445 U.S. 463 (1980)("An illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction.").  Petitioner's assertion that an allegedly illegal arrest somehow deprives the courts of jurisdiction to convict a criminal defendant has been pointedly rejected by the Supreme Court in these and other cases.  *See, e.g., United States v. Alvarez-Machain*, 504 U.S. 655, 661 (1992).

(Petition, Attachment C, 21).  Dawson's September 29, 1997 affidavit filed in support of petitioner's motion for a *Ginther* hearing related the contents of a conversation Dawson purportedly had with Clint Brooks sometime between "August 1996" and "December 1996"  inside the Mason County Jail. Paragraphs 2 and 3 of the affidavit state as follows:

> 2).   During the course of the conversation between myself and Clint Brooks, he asked me if I knew anything about the law.  I told him I knew a little bit, and he went on to say that he was a witness to a shooting, and was going to go to court to testify against someone, and that he had made a deal with the Prosecutor and the Detective for his testimony.  He said they promised him that they would not charge him as a habitual-fourth, after he testified at the trial he would receive an "Early Release" from jail.

> 3).   He asked me if I thought they would keep their end of the deal.  I told him I thought they would.  I then asked him about the shooting.  He told me it happened at Sadie Court Apartments last year in August.  I told him I read something about that.  He told me that he saw the whole thing, but the guy they had did not do the shooting.  He said the guy he seen was Mexican, and the guy in court was not the guy he saw, but he had to keep his end of the deal so he could get early release and not be charged with the habitual.  He talked about his girlfriend and his baby needing him.  He told me he said the guy in court was the shooter just to get early release.  I commented on how glad I was not to be in his shoes.

(Exhibit Attached to Motion for *Ginther* hearing, found in the Michigan Supreme Court record, docket # 39).  Dawson's statement concerning the substance of a conversation he claims to have had with Brooks roughly a year earlier constitutes inadmissible hearsay.   Trial counsel is not constitutionally ineffective for failure to call a witness who cannot offer admissible testimony.[23]   Furthermore,  the trial court conducted a hearing on petitioner's motion for a new trial based on petitioner's theory Clint Brooks had some sort of arrangement with the prosecutor's office relating to Brooks's testimony against petitioner. Petitioner's retained appellate counsel elected not to call Dawson to testify at this hearing.   At the

---

[23]Defense counsel was obviously aware of Dawson's version of this purported jailhouse conversation and its limitations.  Defense counsel's cross-examination of Brooks included questions regarding the specific content of Brooks' conversation with Dawson.  (TT II, 50-51).

conclusion of the hearing, the trial judge court made the following finding: "I find no basis in the record that was made today or any reason to believe that there was a secret deal, that there was a raising of expectations or that anything such occurred. The Court denies the motion . . . ." (HT at 46-47, docket # 37). Petitioner has not presented clear and convincing evidence to overcome the state court factual finding that there was no secret deal with Brooks concerning his trial testimony against petitioner. The state court decision finding no Sixth Amendment violation in trial counsel's decision not to call Dawson as a witness easily passes review under the modified AEDPA deference standards.

7.   Failure to Move to "Sever" the Count III Felon-in-Possession Charge and Request a Limiting Jury Instruction

Petitioner's seventh claim of ineffective assistance of counsel is based on counsel's failure to file a motion to "sever" the felon-in-possession charge or request a limiting jury instruction. Petitioner cites no authority in support of this argument. The Michigan Court of Appeals found no Sixth Amendment violation. Petitioner has not shown any basis for disturbing this determination on habeas corpus review.

8.   Inadequate Impeachment of Anthonette Antes with Her Prior Felony Record

The eighth claim of ineffective assistance of counsel is that counsel was constitutionally ineffective in the cross-examination of Anthonette Antes because counsel did not attempt to impeach Anthonette Antes with her prior criminal convictions. Defense counsel's cross-examination of Ms. Antes, consistent with the defense of mistaken identity, focused on Antes's distance from the shooting location, the rapid sequence of events, her limited opportunity to observe the gunman, and the portions of her statement to police concerning the gunman's muscular appearance. (TT III, 148-53).

-76-

Petitioner argues that counsel was constitutionally ineffective because the cross-examination failed include an attempt to impeach Antes on the basis of her retail fraud and joyriding convictions. No certified copy of any criminal conviction appears in the record. According to petitioner, Ms. Antes had criminal convictions for joyriding and retail fraud. Petitioner provided some support for this contention with what is apparently a portion of a document from the Ingham County Prosecutor's Office disclosing the criminal histories of the deceased victim and of various potential witnesses. (docket # 13, Ex. 3). The entry with regard to Ms. Antes states, "(1) joyriding 93-236-FH 2-24-FH 2-24-94 56-2 Dist. (2) Retail Fraud 2nd - " It is unclear whether the latter charge remained pending or was the result of a conviction.

Petitioner simply assumes that his attorney would have been free to attempt to impeach Ms. Antes with these convictions. Michigan law in effect at the time of petitioner's trial would have made such impeachment difficult, if not impossible. Rule 609 of the Michigan Court Rules generally prohibits attacking the credibility of a witness on the basis of a prior criminal conviction. The Rule allows such impeachment in specified circumstances.

(a) General Rule. For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall not be admitted unless the evidence has been elicited from a witness or established by public record during cross-examination, and

(1) the crime contained an element of dishonesty or false statement, or

(2) the crime contained an element of theft, and

(A) the crime was punishable by imprisonment in excess of one year or death under the law which the witness was convicted, and

(B) the court determines that the evidence has significant probative value on the issue of credibility, if the witness is the defendant in a criminal trial, the court

further determines that the probative value of the evidence outweighs its prejudicial effect.

(b) Determining probative value and Prejudicial Effect. For the purposes of the probative value determination required by subrule (A)(2)(B), the court shall consider only the age of the conviction and the degree to which a conviction of a crime is indicative of veracity . . . .

MRE 609. The rule contains additional restrictions regarding juvenile convictions, convictions that have been the subject of pardon, annulment or a certificate of rehabilitation, and provides that, "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of conviction or of the release of the witness from confinement imposed for that conviction, whichever is the later date." (*Id.*). Six months before petitioner's trial the Michigan Court of Appeals issued its opinion in *People v. Hatch*, No. 168438, 1996 WL 33364392, at * 1 (Mich. Ct. App. May 10, 1996) which held that a "joyriding," conviction, otherwise known as unlawful driving away of an automobile (UDAA) under state law, was not admissible under Rule 609 of the Michigan Rules of Evidence." "UDAA, more commonly known as 'joyriding' is not a theft offense," and trial court properly prohibited the impeachment of two prosecution witnesses with their prior UDAA convictions. (*Id.*) (citing *People v. Hendricks*, 521 N.W.2d 546 (Mich. 1994)). Furthermore, assuming *arguendo*, that petitioner's attorney had been able to convince the trial court that joyriding was a "theft offense," defense counsel would have still faced the hurdle of demonstrating that the evidence had significant probative value on the issue of credibility.

In November of 1996, Michigan's appellate courts had not yet addressed the issue of the admissibility of a second degree retail fraud conviction. A year after petitioner's trial, the court of appeals noted that there are numerous ways Michigan's second degree retail fraud statute can be violated. While some convictions involve *crimen falsi*, many do not. *See People v. Parcha*, 575 N.W.2d 316, 321-22 (Mich. Ct. App. 1997). The Michigan Court of Appeals has held that allowing impeachment by a second-

degree retail fraud conviction constitutes error. *See People v. Frost*, No. 192240, 1998 WL 1991279, at * 2 (Mich. Ct. App. May 29, 1998). Assuming for present purposes that Ms. Antes had been convicted of second degree retail fraud, and further assuming that her conviction was within the admissible ambit of Rule 609(a) of the Michigan Rules of Evidence, the added impeachment would have been minimal and may have proved harmful by distracting the jury from counsel's well-organized and focused cross-examination of Ms. Antes. The decision of the Michigan Court of Appeals finding no Sixth Amendment violation clearly passes review under AEDPA.

9.      Failure to Object to the Assistant Prosecutor's Closing Argument that an Alternative Suspect was not Worth Looking At

Petitioner's ninth claim of ineffective assistance of counsel is that his trial attorney was constitutionally ineffective in failing to object to a portion of the prosecutor's rebuttal argument. Defense counsel argued that this was a case of mistaken identity, and that the misidentification was possible because the police failed to conduct an adequate investigation when they did not check for Mark Mattox's fingerprints. (TT VI, 202-03). The prosecutor's rebuttal argument included the following sentence: "But the police didn't compare them to Mark's prints because there was not one evidence [sic], not one witness, not one anybody who said that he was even worth looking at." (TT IV, 213). There was no evidence that any witness came forward to the police indicating that Mark Mattox should be considered a suspect. Petitioner had gone into hiding and taken a key witness with him. The rebuttal argument was unobjectionable. Counsel is not ineffective for failure to raise meritless objections. I find that this claim does not provide any basis for federal habeas corpus relief under applicable standards.

10.  Failure to Object and Move for a Curative Instruction

Petitioner's tenth claim of ineffective assistance of counsel is that counsel was constitutionally deficient when he failed to object and move for a curative instruction on the basis of closing argument which "attacked defense arguments that Mark Mattox was the assailant." (Petition, Attachment C at 23). This argument is frivolous. The purpose of rebuttal argument is to provide the prosecutor with an opportunity to respond to the defendant's closing argument. No further discussion is warranted. This claim fails to provide a basis for federal habeas corpus relief.

11.  Sentencing

Petitioner's eleventh claim of ineffective assistance of counsel is that counsel was constitutionally ineffective for "failing to show Michael Austin's extensive criminal history of violence." Petitioner never claimed that he shot Michael Austin in self-defense. Petitioner's defense was that this was a case of mistaken identity and that his brother was the person who shot Mr. Austin. During petitioner's allocution at sentencing he continued to assert that his convictions were based on mistaken identity. (ST, 5-6). Judge Carolyn Stell found that petitioner's actions were "exceptionally cold-blooded" and constituted "senseless violence." (ST, 7-8). Petitioner offers no explanation, and I am at a loss to guess, what possible benefit petitioner could have possibly gained at sentencing if counsel had attempted to introduce evidence that the deceased victim had an "extensive criminal history of violence." (Petition, Attachment C, 23). This claim of ineffective assistance of counsel is frivolous.

12.     Failure to Object to Improper Instruction

Petitioner's twelfth claim of ineffective assistance is that counsel violated Sixth Amendment standards when he did not object to the jury instructions.  (Petition, Attachment C, 24).  Petitioner contends that counsel should have objected to the instruction on assault with intent to commit murder.  MICH. COMP. LAWS § 750.83.  Petitioner fails to provide any coherent argument in connection with this claim, but simply quotes an excerpt from the court's instructions:

The defendant is charged in Count I with the crime of assault with intent to murder.  To prove this charge, the Prosecutor must prove the following elements beyond a reasonable doubt:

First, that Defendant *tried to physically injure* another person.

Second, that when the Defendant committed the assault, he had the ability *to cause an injury* or at least believed that he had the ability.

Third, that the defendant *intended to kill* the person he assaulted.

(TT IV, 232).   This instruction precisely tracks Michigan's standard criminal jury instruction 17.3, accurately states the elements of  assault with intent to murder, and was patently unobjectionable.

The petition also states, "Attachment C:  Habeas Petition Question 12 Grounds Raised," without further elaboration other than the statement, "[t]rial counsel failed to object to these instructions." (Petition, Attachment C, 25) (emphasis in original).  Petitioner is apparently referring back to the claims he asserted in Ground III:  (1) that a portion of the  an instruction on the assault with intent to murder charge referred to the "alleged killing" rather than the alleged assault; (2) the instructions did not include a limiting instruction that petitioner's status as a felon could not be considered as evidence on Counts I and II; and (3) that the judge gave the standard reasonable doubt instruction, "thereby diluting the people's

-81-

burden of proof." (Petition, Attachment C, 3-4). There was no error in the reasonable doubt instruction, and accordingly, no basis for any objection. The lack of a limiting instruction was not itself an instructional error. The instruction regarding the necessary intent to kill on the assault with intent to murder charge incorrectly referred to the "alleged killing" rather than the "alleged assault." (TT IV, 233). When the error is viewed in context, it is inconsequential. It was undisputed that the victim was shot in the face at point-blank range. The victim died before petitioner's trial. Petitioner was not charged with or convicted of murder. The court's instructions adequately conveyed to petitioner's jury the prosecution's burden to prove that petitioner intended to kill Mr. Austin. (TT IV, 233). The Michigan Court of Appeals held that none of defense counsel's purported errors relating to the jury instructions violated petitioner's constitutionally-guaranteed rights. I find no basis for disturbing petitioner's convictions under the applicable standards of review.

13.   Failure to Object During Cross-Examination Regarding Petitioner's Trip to Virginia in Violation of the Terms of His Parole and Limitations and Suspensions of Petitioner's Driving Privilege

Petitioner's thirteenth claim of ineffective assistance of trial counsel, quoted in its entirety, is as follows: "Trial counsel failed to object to prejudicial evidence that Petitioner violated his parole by leaving the state, and that his drive[r]'s licence had been suspended." (Petition, Attachment C, 25). During direct examination, petitioner testified that he was on parole during the relevant time period and that he was required to have a permanent residence. (TT IV, 78). He stated that he had an understanding with his parole officer and that she allowed him to stay overnight at Sabrina Johnson's apartment. (TT IV, 79-81). Petitioner testified that he generally traveled between Lansing and Detroit by borrowing Sabrina's car or taking a Greyhound Bus. (TT IV, 82-83). Petitioner testified that he made all the arrangements

necessary to be married to Sabrina in Georgia before traveling to Georgia.  (TT IV, 78).  Petitioner offered significant direct examination testimony regarding how he needed to get to Detroit to meet with his parole officer.  (TT IV, 96).  Petitioner testified that on the date Mr. Austin was shot petitioner drove Sabrina's car to various locations, including the Wheeler Dealer.  (TT IV, 100, 104, 106).  The prosecutor's abbreviated cross-examination regarding petitioner leaving Michigan in apparent violation of the terms of his parole (TT IV, 146)[24] and single question inquiring whether petitioner's driving privileges had been restricted by the State of Michigan (TT IV, 147) were unobjectionable.  Defense counsel was not required to raise frivolous objections.  The state-court finding of no Sixth Amendment violation easily passes muster.  In summary, I find that the claims of ineffective assistance of counsel asserted in Ground VIII do not provide a basis for granting petitioner habeas corpus relief.


I.      **Cumulative Effect (Ground IX)**

        Ground IX is petitioner's claim that the "cumulative effect" of all the alleged errors deprived him of a fair trial.  Such catch-all "cumulative effect" arguments are common in habeas corpus petitions and are ineffectual as grounds for habeas corpus relief under AEDPA standards.  The Sixth Circuit succinctly dispatched a recent "cumulative effect" argument by a habeas corpus petitioner in these terms:

        As a final argument to support habeas relief, Mr. Millender argues that the cumulative effect of the alleged errors he presents supports granting relief.  In addition to finding no errors to consider even if such a task were within this Court's province, we reiterate that "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief."

---

        [24]On redirect examination petitioner testified that he had permission from his parole officer to leave the State of Michigan.  (TT IV, 164).

*Millender v. Adams*, 376 F.3d 520, 529 (6th Cir. 2004), *cert. denied*, 544 U.S. 921 (2005) (quoting *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *see Gillard v. Mitchell*, 445 F.3d at 898. Ground IX does not provide basis for granting petitioner's request for habeas corpus relief.


J.    **Ineffective Assistance of Counsel: (A) Failure to Call Sabrina Johnson-Mattox and Tammy Lee as Witnesses; (B) Failure to object and Move for a Curative Instruction; and (C) Cumulative Effect of Trial Counsel's Errors (Ground X)**

Ground X contains 4 additional claims of ineffective assistance of trial counsel. Petitioner argues that counsel was constitutionally ineffective for failure to call Sabrina Johnson-Mattox as a witness. Detective Owen Detrick's trial testimony documented the extensive and unsuccessful efforts the prosecution made to serve Sabrina Johnson and Sylvia Johnson with trial subpoenas. (TT IV, 12-16). Nothing in the trial court record shows that petitioner's trial attorney stood on any different footing with regard to the ability to produce Sabrina Johnson's testimony. However, assuming that defense counsel had the ability to produce Sabrina's testimony, there were obvious strategic reasons for not eliciting her testimony. As the criminal defendant, petitioner had the unique opportunity to sit and listen to the testimony of the prosecution's witnesses before electing to take the witness stand and offering his own testimony. Sabrina Johnson would have lacked that opportunity, as she would have been sequestered while the other witnesses testified. Petitioner's detailed story concerning his actions and Sabrina's actions on the date Michael Austin was shot would have been severely undermined by discrepancies between petitioner's version of events and Sabrina's. The Michigan courts rejected this claim of ineffective assistance of counsel, finding that a July 24, 1998 affidavit purportedly by Sabrina Johnson-Mattox did not warrant post-conviction relief. The affidavit was replete with hearsay, including statements allegedly made by petitioner concerning actions he wanted trial counsel to take, Sabrina's statement expressing her

-84-

desire to testify in petitioner's behalf, and the responses petitioner's attorney allegedly provided. Petitioner long ago waived any attorney client privilege regarding the advice of counsel. No affidavit from Attorney Cooper was offered in support of petitioner's request for post-conviction relief. There is certainly nothing supporting Sabrina's affidavit's assertion that, "I told him [Mr. Cooper] to call me as a witness because I saw who shot Michael Austin and it wasn't Todd. Mr. Cooper told me that he didn't want me as a witness because the prosecutor's case was 'terribly weak,' and that he was going to beat the case so stop worrying." (Affidavit, ¶ 11, copy found in record of Michigan Supreme Court, docket # 41). Among other things, Johnson-Mattox's belated affidavit asserts that Mr. Austin had been the aggressor and/or that the shooting had been an accident. Nothing in the record shows that Sabrina Johnson-Mattox's testimony to this effect was available to defense counsel at the time of petitioner's trial. There is no basis for a finding of ineffective assistance of trial counsel under either component of the *Strickland* standard.

Next, petitioner argues that trial counsel was constitutionally ineffective for not calling Tammy Lee as a witnesses. The trial transcript shows that defense counsel made a strategic decision not to call Ms. Lee as a witness. (TT IV, 5, docket # 35). Ms. Lee gave medical assistance to the victim at the crime scene. Ms. Lee did not witness the shooting, only its bloody aftermath. Ms. Lee's testimony would have only served to reinforce the horrific nature of the victim's injuries. Defense counsel certainly cannot be faulted for a decision not to call Ms. Lee as a witness.

Petitioner argues that his counsel was constitutionally ineffective for failure to object to the portion of the prosecutor's rebuttal argument mentioning the Wheeler Dealer: "Well, one of the details that he gave you quite a bit about was the fact that the newspaper, the Wheeler Dealer, that prints up ads in our

community is an automotive shop."  (TT IV, 215).[25]  As shown in the discussion of the corresponding claim of prosecutorial misconduct in Ground VI, this argument came in rebuttal to defense counsel's argument that petitioner's testimony was too detailed to have been false.  Any objection would have been inconsequential.  The prosecutor could have easily continued by substituting any number of details from petitioner's testimony such as his stopping to buy bottled water at the Quality Dairy, arriving back at Sabrina's apartment at 12:25 p.m., and receiving Sabrina's "disturbing" telephone call a short time thereafter.

Petitioner's cumulative effect argument does not provide any basis for relieving him of his criminal convictions for the reasons previously stated.

In summary, petitioner's arguments do not satisfy either the performance or prejudice components of the Sixth Amendment standard.

## K.      Alleged Use of Perjured Testimony (Ground XI)

Ground XI is petitioner's claim that his conviction should be overturned because the prosecutor used perjured testimony to obtain petitioner's conviction.  The Fourteenth Amendment right to due process prohibits a knowing and deliberate use by a state of perjured evidence in order to obtain a conviction.  *See Naupe v. Illinois*, 360 U.S. 264, 269 (1959); *Mooney v. Holohan*, 294 U.S. 103, 112

---

[25]Shortly after beginning their deliberations the jury sent out the following note: "Can we clarify what does the Wheeler Dealer have on site?  Is it just an office or does it have a garage for services?  How can we clarify this?  Was it in the testimony or closing statements?"  (TT IV. 242).  The Judge Stell discussed this note with counsel and an agreement was reached concerning the response to the jury's note.  (TT IV, 241).  Judge Stell instructed the jury, "I would remind you that you have your packet of instructions as to the elements of each of these three crimes.  We would instruct you to direct your attention to those elements and not to other matters.  Please continue your deliberations."  The jury must be presumed to have followed the judge's instructions.

(1935); *accord Foley v. Parker*, No. 04-5746, __ F.3d __, 2007 WL 1437435, at * 12 (6th Cir. May 17, 2007); *King v. Trippett*, 192 F.3d 517, 522-23 (6th Cir. 1999); *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1999); *Burks v. Egeler*, 512 F.2d 221, 224 (6th Cir. 1975).   However, perjured testimony, without more, does not rise to the level of a constitutional violation.   *See Briscoe v. LaHue*, 460 U.S. 325, 327 (1983); *Sanders v. Sullivan*, 863 F.2d 218, 222 (2d Cir. 1988).   It is the knowing and deliberate use of the perjured evidence by the prosecution that constitutes the constitutional infringement.   *Burks*, 512 F.2d at 224.   In order to raise a constitutional violation, petitioner must make "a showing of prosecutorial involvement in the perjury."   *Burks*, 512 F.2d at 229.   While knowing use of perjured testimony by the prosecutor can violate a defendant's constitutional rights, there is no underlying factual basis for such a finding in this case.

Petitioner contends that false testimony was provided to the district judge who issued the warrant for petitioner's arrest.   (Petition, Ex. 1).   This testimony was not used as evidence to secure petitioner's criminal conviction.   Petitioner's argument obviously does not provide a basis for relieving him from his state-court criminal convictions.

Petitioner also argues that the testimony from Clint Brooks and Dawn Bethany identifying him as the gunman was "false."   Petitioner's disagreement with, or belief in the inconsistency of, testimony by various witnesses does not demonstrate perjury, nor does it demonstrate the knowing use of perjured testimony by the prosecutor.   This court does not make credibility determinations on habeas corpus review.   Ground XI does not provide any basis for granting petitioner federal habeas corpus relief.

**L.     Ineffective Assistance of Appellate Counsel (Ground XII)**

Ground XII consists of 12 claims ineffective assistance of appellate counsel.  I find that petitioner's claims fail to provide any basis for granting federal habeas corpus relief.  Petitioner was represented by two attorneys in his direct appeal.  Petitioner was initially represented by appointed appellate counsel, Attorney Kenneth A. Birch.  (Petition, Ex. 5).  In accordance with petitioner's request, Attorney Birch filed a motion to withdraw, and after conducting a hearing, on June 16, 1997, the court entered an order discharging Birch from representing petitioner.  Petitioner argues that Attorney Birch was constitutionally ineffective in five ways:

(1) he failed to start preparing a brief on petitioner's behalf;

(2) he failed to order transcripts necessary for preparation of a brief;

(3) he filed two motions for extensions of time for filing an appellate brief;

(4) he visited petitioner on one occasion to discuss appellate issues; and

(5) he withdrew from the representation with the court's permission.

(Petition, Attachment C at 32).  Claims of ineffective assistance of appellate counsel are measured under the *Strickland* standard.  *Evitts v. Lucey*, 469 U.S. 387 (1985).  Not just any deficiency in counsel's performance will suffice.  The assistance of appellate counsel must be "so ineffective as to violate the Federal Constitution."  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  Therefore even assuming *arguendo* that some aspect Birch's representation of petitioner after sentencing and before the court's order discharging Birch from the appellate representation of petitioner fell below an objective standard of reasonableness, it is patent that petitioner suffered no prejudice.  Petitioner's appeal remained pending in

-88-

the Michigan Court of Appeals, and petitioner's retained appellate counsel Ashford filed a 50-page appellate brief, a reply brief, and several motions on petitioner's behalf in the Michigan Court of Appeals. Petitioner's claims of ineffective assistance of counsel by Attorney Birch fail to provide a basis for federal habeas corpus relief.

Petitioner argues that Attorney Linda Ashford's appellate representation was constitutionally deficient in the following respects:

(1) she was rushed into filing a brief on petitioner's behalf;

(2) she refused to file a supplemental brief (*See* Petition, Ex. 11);

(3) the Michigan Court of Appeals rejected a *pro se* brief filed by petitioner;

(4) she "failed to file an issue concerning the Appellate Court[']s Constitutional violations of Petitioner's right to appeal by not appointing him new counsel, since he himself was indigent and unable to retain counsel;"

(5) she "refused to file issues that would have assisted the Petitioner within the Appellate Court to have his illegal and unconstitutional conviction[s] reverse[d];"

(6) "if retained counsel would have had the opportunity she would have filed a[n] issue arguing that trial counsel was ineffective for failing to prepare the Petitioner's case for trial" based on the absence of discovery requests, inadequate witness interviews, the absence of objections to the actions "of the detective and the prosecutor," failure to "call as a very important witness Sabrina Mattox who would have given exculpatory testimony beneficial to the defense, as well as Tammy Lee;" and

(7) "Appellate counsel was unable to prepare a brief that could be reviewed by the Appellate Courts with some understanding of how Petitioner's conviction should be reverse[d]."

Other than the claims of ineffective assistance of appellate counsel presented in Ground XII, retained appellate counsel Ashford raised almost every issue petitioner has asserted in his habeas corpus petition.

Petitioner wanted appellate counsel to raise additional issues.  For example, petitioner wanted her to include a patently meritless issue regarding a voir dire exchange between the judge and a prospective juror.  Ashford's April 14, 1998 letter (Petition, Ex. 10) stated that she had not included a meritless claim mentioned by petitioner.  She advised petitioner that he suffered no possible prejudice from a question by a prospective juror and the response given by the judge.  Petitioner claimed that a prospective juror had asked whether the shooting victim had died and that the judge's response was  that he didn't know.  Petitioner has never formulated a coherent theory of how such an exchange between the judge and prospective juror could have deprived petitioner of a fair trial.

        In the case of appellate counsel, petitioner has no constitutional right to have had every nonfrivolous issue raised on appeal.  *Jones v. Barnes*, 463 U.S. 745 (1983).  Tactical choices regarding issues on appeal are properly left to the sound judgment of counsel.  *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998); *United States v. Perry*, 908 F.2d 56, 59 (6th Cir. 1990).  "'Winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. at 751-52)).  Petitioner's appellate counsel raised numerous claims on petitioner's behalf on direct appeal.  Where appellate counsel is charged with ineffectiveness for failure to raise a particular claim, "it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000).  To overcome the presumption of competence of appellate counsel in these circumstances, a petitioner must show that the omitted issues were "clearly stronger" than those counsel chose to assert.  *Id.*; *see Williams v. Bagley*, 380 F.3d 932, 971 (6th Cir. 2004); *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).  In the present case, the issues raised by appellate counsel all had a far better

chance of success than any grounds that petitioner now claims were unconstitutionally omitted.  I find no error by appellate counsel, much less any Sixth Amendment violation.

### Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.  I find that all the grounds raised by petitioner are meritless and that the instructional error claims asserted in Ground III are barred by procedural default.

Dated:   June 13, 2007                              /s/  Joseph G. Scoville
                                                              United States Magistrate Judge

### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *McClanahan v. Commissioner*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).